## CULP v. UNITED STATES.

### NANCE v. SAME.

### MILLER v. SAME.

Nos. 12219–12221.

Circuit Court of Appeals, Eighth Circuit.

Nov. 4, 1942.

Charles D. Frierson, of Jonesboro, Ark. (Wils Davis, of Memphis, Tenn., and John A. Fogleman and James C. Hale, both of Marion, Ark., on the brief), for appellants.

Leon B. Catlett and W. H. Gregory, Asst. U. S. Attys., both of Little Rock, Ark. (Sam Rorex, U. S. Atty., of Little Rock, Ark., and Thomas J. Dodd, Sp. Asst. to Atty. Gen., on the brief), for appellee.

Before SANBORN, THOMAS, and JOHNSEN, Circuit Judges.

SANBORN, Circuit Judge.

The appellants and others were indicted under § 88, 18 U.S.C.A.,[1] for having conspired to commit an offense defined in § 52, 18 U.S.C.A.[2] These appeals are from judgments of conviction entered upon verdicts of a jury. The questions for review, are, broadly, (1) whether the indictment charged a conspiracy "to commit any offense against the United States," and (2) whether the appellants were denied a fair trial for any of the reasons asserted by them.

The defendants named in the indictment are Howard Curlin, Sheriff of Crittenden County, Arkansas, Omer Curlin, a Deputy Sheriff of that County and keeper of the county jail at Marion, Arkansas, C. C. Culp, a Deputy Sheriff of Crittenden County and City Marshal of the city of West Memphis, Arkansas, Harold D. Holland, a patrolman of the Arkansas State Police, Cecil B. Nance, a practicing attorney of Marion, Arkansas, and Jim Miller, an inmate of the Crittenden County Jail in Marion.

The indictment charges that the defendants Howard Curlin, Omer Curlin, C. C. Culp and Harold D. Holland were law enforcement officers of the State of Arkansas and of the County of Crittenden and of the governmental subdivisions thereof; that from on or about January 1, 1937, "up to and including on or about the 1st day of January, 1941," all of the defendants conspired to violate § 52, 18 U.S. C.A., in that they would, under color of specified laws of the State of Arkansas, of specified ordinances of the city of West Memphis, Arkansas, and of Marion, Arkansas, and under color of custom, subject certain named citizens and inhabitants of Arkansas, Tennessee and other States and inhabitants and citizens of various States whose names are unknown, all such persons, named and unnamed, being referred to collectively as "victims," to the deprivation of rights, privileges and immunities

secured to them and protected by the Constitution and laws of the United States— "to-wit: the right and privilege of being free from arrest and restraint of their liberty, save and except by due process of law, the right and privilege of being free from unlawful intimidation and unlawful assault on their persons, the right to be free from the infliction of cruel and unusual punishment upon their persons, the right to have a speedy and public trial, the right to be confronted with the witnesses against them, the said victims; the right to be admitted to bail; the right and privilege of being secure in their persons, property, and effects;"—by causing such inhabitants and citizens to be arrested without cause, to be imprisoned in the jail at West Memphis or at Marion, to be falsely charged with violations of the laws of Arkansas or the ordinances of West Memphis or of Marion, to be unlawfully held in jail for long periods of time without being permitted to communicate with any persons outside of jail, and to be beaten and assaulted for purposes of extortion; that, after the "victims" had been held in jail and assaulted, they would be advised that they could secure their release only by communicating with the defendant Nance; that Nance, when conferred with by the "victims," would tell them that they could be released only upon payment of large sums of money to Nance or to another of the defendants; that, after conferring with Nance, the "victims" would be permitted to communicate with relatives or friends to obtain the funds demanded for the release of the "victims;" and that, when the money had been obtained or delivered to Nance or one of the other defendants, the "victims" would, in many instances, be taken before local magistrates, who would be directed by one or more of the defendants to enter upon their (the magistrates') dockets the imposition of certain fines or pretended fines

---

[1] "If two or more persons conspire either to commit any offense against the United States, or to defraud the United States in any manner or for any purpose, and one or more of such parties do any act to effect the object of the conspiracy, each of the parties to such conspiracy shall be fined not more than $10,000, or imprisoned not more than two years, or both."

[2] "Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects, or causes to be subjected, any inhabitant of any State, Territory, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution and laws of the United States, or to different punishments, pains, or penalties, on account of such inhabitant being an alien, or by reason of his color, or race, than are prescribed for the punishment of citizens, shall be fined not more than $1,000, or imprisoned not more than one year, or both."

based upon false charges of crimes and misdemeanors filed by the defendants against the "victims" for the purpose of extorting money from them. The indictment then alleges that, in furtherance of the conspiracy, twenty-six overt acts were committed by one or more of the defendants. The overt acts include arrests and imprisonments of "victims," without cause, by Culp and Holland, and assaults committed upon "victims" by those officers, the receipt of money from "victims" by Nance and by Howard Curlin, paid to them by "victims" in order to secure release from imprisonment, the receipt by Jim Miller of money from "victims," paid to him "as the operator of a kangaroo court then and there conducted in the Crittenden County jail at Marion" and in order to avoid being beaten by him, extortion of money by Miller and Omer Curlin from a "victim" under threat of assault, the extortion of money from a "victim" by Nance, Culp and Holland, and an assault and beating committed upon a "victim" by Miller while the "victim" was in the Crittenden County jail at Marion.

All of the defendants entered pleas of not guilty. Howard Curlin, the Sheriff of Crittenden County, died prior to the trial.

Since the appellants do not argue, in their brief, that the evidence of the Government was insufficient to sustain their convictions, a detailed discussion of the evidence is unnecessary. It is enough to say that the Government produced some fifty witnesses to sustain its charges, and that their evidence tended to prove a confederation of the defendants to procure the arrest and imprisonment, under color of state law, without cause, of inhabitants of the United States, and to abuse and mistreat them in order to induce them to purchase their release, and to make it appear upon the dockets of local magistrates that such inhabitants had entered pleas of guilty to, and had been fined for, offenses which they had not committed; that Culp, Holland, Howard Curlin, and Omer Curlin were officers of the State; that they, or some of them, would make the false arrests under color of state law and would abuse and beat the "victims" while arresting them and taking them to jail; that Omer Curlin was the keeper of the jail at Marion; that Jim Miller was an inmate of the jail and was the head of a "kangaroo court," and, as such, imposed small fines or fees upon the "victims;" that if they were unable or unwilling to pay these fines or fees, they were beaten with a leather strap; that Nance was the only lawyer and the only person, outside the jail, with whom the "victims" were initially allowed to communicate; that, after the "victims" had been advised by Nance of the amount of money required to secure their release, they were permitted to communicate with friends and relatives in order to secure the funds required; and that, when the money was paid over to Nance, the release of the "victims" followed.

The evidence of the defendants tended to show, in substance, that there was no collusion between them to have anyone falsely arrested or falsely imprisoned under color of state law; that the "victims" were all law violators, properly arrested and imprisoned, none of whom was assaulted unless in resisting arrest; that the "victims," if sober, were not prevented from communicating with friends, relatives and lawyers other than Nance; that the "victims" were not beaten or abused while in jail; that the activities of Jim Miller were confined to making voluntary collection of small sums to be used for the benefit of all inmates of the jail at Marion; and that Nance was regularly retained as a lawyer by the "victims" and acted as their counsel without any agreement with the other defendants as to splitting fees.

The jury acquitted Omer Curlin and Holland, but found the other defendants, who are the appellants here, guilty.

The first contention of the appellants is that the court had no jurisdiction to try them, because the offense which they are charged with having conspired to commit was not an offense against the United States. They argue that any rights of which the "victims" may have been deprived are not "rights, privileges, or immunities secured or protected by the Constitution and laws of the United States" within the meaning of § 52, 18 U.S.C.A.

The due process clause of the Fourteenth Amendment to the Constitution of the United States prohibits any state from depriving any person of life, liberty, or property, without due process of law. Section 5 of the Fourteenth Amendment provides that "the Congress shall have power to enforce, by appropriate legislation, the provisions of this article." It is true that the Fourteenth

Amendment added nothing to the rights of one citizen or inhabitant of the United States as against another. It furnished "an additional guaranty against any encroachment by the States upon the fundamental rights which belong to every citizen as a member of society." United States v. Cruikshank, 92 U.S. 542, 554, 23 L.Ed. 588. The right to the enjoyment of life and liberty and the right to acquire and possess property are fundamental rights of the citizens of the several states and are not dependent upon the Constitution of the United States or the Federal Government for their existence. Hodges v. United States, 203 U.S. 1, 15, 27 S.Ct. 6, 51 L.Ed. 65. The due process clause of the Fourteenth Amendment, however, proscribed state action which deprives a person of his fundamental rights without due process of law. The words of the Amendment are prohibitory, "but they contain a necessary implication of a positive immunity, or right." Strauder v. West Virginia, 100 U.S. 303, 307, 310, 25 L.Ed. 664. "A right or an immunity, whether created by the Constitution or only guaranteed by it, even without any express delegation of power, may be protected by Congress." Strauder v. West Virginia, supra, 100 U.S. page 310; United States v. Reese, 92 U.S. 214, 217, 23 L.Ed. 563. The states, in adopting the Fourteenth Amendment, expressly delegated to Congress the power to provide for the enforcement of its provisions by appropriate legislation. Sec. 52, 18 U.S.C.A., Sec. 20 of the Criminal Code, was enacted in the exercise of that power. That this section has not lost any of its vitality since it was originally enacted, is indicated by the recent opinion of the Supreme Court of the United States in United States v. Classic, 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368. At page 326 of 313 U.S., at page 1043 of 61 S.Ct., the Supreme Court, speaking of this section, said: "Misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is action taken 'under color of' state law. Ex parte [State of] Virginia, 100 U.S. 339, 346, 25 L.Ed. 676; Home Telephone & Telegraph Co. v. Los Angeles, 227 U.S. 278, 287 et seq., 33 S.Ct. 312, 314, 57 L.Ed. 510; Hague v. C. I. O., 307 U.S. 496, 507, 519, 59 S.Ct. 954, 960, 965, 83 L.Ed. 1423; cf. Id., 3 Cir., 101 F.2d 774, 790." The Supreme Court also said, on page 327 of 313 U.S., at page 1043 of 61 S.Ct., 85 L.Ed. 1368, that § 52 authorizes the punishment of two different offenses. "The one is willfully subjecting any inhabitant to the deprivation of rights secured by the Constitution; the other is willfully subjecting any inhabitant to different punishments on account of his color or race, than are prescribed for the punishment of citizens."

■ We do not doubt that the immunity of an inhabitant of the United States from a deprivation of life, liberty, or property by state action not amounting to due process of law is an immunity secured and protected by the due process clause of the Fourteenth Amendment. See opinion of Mr. Justice Stone in Hague v. C. I. O., 307 U.S. 496, 524–527, 59 S.Ct. 954, 83 L.Ed. 1423.

■■ It is our opinion that a state law enforcement officer who, under color of state law, willfully and without cause, arrests and imprisons an inhabitant of the United States for the purpose of extortion, deprives him of a right, privilege, and immunity secured and protected by the Constitution of the United States, and commits one of the offenses defined in § 52, 18 U.S.C.A. It necessarily follows that an agreement between state law enforcement officers and others to extort money from inhabitants of the United States by causing their arrest and imprisonment, without justification, by such officers and under color of state law, would be a conspiracy under § 88, 18 U.S.C.A. We think that the District Court did not err in taking jurisdiction of this case.

The next point argued by the appellants is that the indictment was invalid because "the alleged overt acts concerning kangaroo court are not based upon any allegation in the conspiracy charge of the indictment and because no act of any state officer under color of any state law or city ordinance is alleged as to the assaults and batteries by Jim Miller, and he, himself, is not an officer."

■ The indictment, as has already been shown, sufficiently described the nature of the conspiracy, its object, and the means which were to be employed in executing it. There is no requirement that the overt acts charged in a conspiracy indictment must be described in that part of the indictment which charges the conspiracy. The purpose of alleging in a conspiracy indictment that one or more overt acts were committed in execution

of the conspiracy, is to show that it is the kind of conspiracy denounced by § 88, 18 U.S.C.A. "An indictment attempting to charge conspiracy is sufficient if it follows the language of the statute and contains a sufficient statement of an overt act to effect the object of the conspiracy, excepting where the object of the conspiracy is in itself lawful, and in such case the means must be set forth with such particularity as to disclose their illegality and the intended criminal intent, * * *." Jelke v. United States, 7 Cir., 255 F. 264, 275. If it were true that some of the overt acts referred to in the indictment were insufficiently or improperly alleged, that would not invalidate the indictment, since the commission of other overt acts was properly and sufficiently charged. That Jim Miller was not, and was not alleged to be, a state officer would not affect the validity of the indictment, since the fact that he could not commit the offense which was the alleged object of the conspiracy would not prevent him from agreeing with those who could commit it that the offense should be committed. United States v. Rabinowich, 238 U.S. 78, 86, 35 S.Ct. 682, 59 L.Ed. 1211; Coffin v. United States, 162 U.S. 664, 669, 16 S.Ct. 943, 40 L.Ed. 1109; Curtis v. United States, 10 Cir., 67 F.2d 943, 946; Carter v. United States, 8 Cir., 19 F.2d 431, 433.

 It is next asserted by the appellants that the court sustained an uncertain and indefinite indictment by upholding the jurisdiction of the federal court "to supervise and try anew in criminal proceedings misdemeanor charges of which mayors and magistrate courts of Arkansas had assumed jurisdiction." This assertion, we think, misconceives the nature of the offense charged in the indictment. The appellants were charged with a conspiracy to violate § 52, 18 U.S.C.A., and over that offense no court or magistrate of Arkansas had, or had assumed, any jurisdiction. That the dockets of magistrates in Arkansas indicated that some of the "victims" of the conspiracy had entered pleas of guilty to violations of the laws of Arkansas or of ordinances of West Memphis or Marion, did not preclude the Government from alleging and proving that the "victims" of the conspiracy had been deprived of rights and immunities secured and protected by the due process clause of the Fourteenth Amendment, and that the proceedings before the magistrates were a mere pretense brought about by

the unlawful acts of the defendants in furtherance of the conspiracy charged.

 The appellants contend that the court erred in refusing to strike the evidence of Arthur Hall Patterson, a witness for the Government, because it appeared that he was not arrested nor fined and because his evidence has no probative value. Patterson, a resident of Memphis, Tennessee, testified that on or about July 20, 1940, when he was twenty years of age, he accompanied Leland Watts in an automobile on a trip to West Memphis, Arkansas; that they left Memphis about 11:30 at night and went to a place in or near West Memphis, where "they sell beer and dance," and stayed there about two hours; that they then started back toward Memphis; that he (Patterson) fell asleep in the car; that Watts was driving; that "the first thing I knew I was pulled out of the car and someone was hitting me. I did not make any fight. I pulled away from the man because I didn't know what else to do and I did not know he was an officer, nor had he told me he was. I ran away and was shot and fell down. I was shot in the back." The Government proved by Leland Watts that both he and Patterson were asleep in the automobile off of the highway near "Sam's place" in or near West Memphis, Arkansas; that the appellant Culp arrived on the scene; that he first woke Watts and asked what he had been drinking; that Culp then woke Patterson by shaking him, hit him over the head with a blackjack, and jerked him out of the car and "went to hitting him, and in the meantime this boy [Patterson] jerked loose and ran, and had run some twenty or twenty-five feet and that is when Mr. Culp shot three times, and one of them hit him and he fell." The Government's evidence also showed that Culp and a filling station attendant, after Patterson fell, dragged him over to Culp's car, in which were two negro boys who had been arrested by Culp; that they were in the back seat, and that Culp put Patterson on the floor between the back and front seats. There are other revolting details of the treatment accorded Patterson by Culp, but it is not necessary to refer to them. Patterson was taken to the City Hall or jail in West Memphis, where he lapsed into unconsciousness, and was then released and sent to a hospital, where he finally recovered. His companion, Watts, was sent to the jail at Marion and was released the next day, after "seeing

Mr. Nance." The Government's evidence showed that neither Watts nor Patterson was drunk or had created any disturbance. We think that the facts that Patterson was not formally placed under arrest, that he was not imprisoned, and that no charge was filed against him before any magistrate, had not the slightest effect upon the competency of his evidence. According to the Government's evidence relating to this incident, Patterson was taken into custody, deprived of his liberty without cause, and very nearly deprived of his life, by Culp. The appellants' version of this occurrence, of course, differed from that of the Government, but, for purposes of review we are required to regard the evidence in the light most favorable to the Government. Galatas v. United States, 8 Cir., 80 F.2d 15, 23; Marx v. United States, 8 Cir., 86 F.2d 245, 250; Walker v. United States, 8 Cir., 93 F.2d 383, 392.

■■■ The appellants contend that the court erred "in permitting a number of witnesses to testify, although they were not named as 'victims' nor in overt acts;" and assert: "The only victim under Sec. 52, Title 18 U.S.C.A., must be some identified resident of some state, but the jury was left to convict on such incidents as the Millsaps case and others without any notice from the indictment." This point and the supporting argument are too vague and general to call our attention to any specific action of the court which it is claimed was erroneous, or to invoke from us any detailed discussion of what the appellants refer to as the Millsaps case, which, according to the Government's evidence, involved the beating of a colored boy by Culp and Holland for the purpose of compelling him to testify that his father, who had been accused of murder, had told the boy that he (the father) had committed the murder. The Millsaps case also involved the collection by Nance, from the father, of a fee of eleven hundred dollars, or more, after Nance had agreed to defend him against all charges, civil and criminal, for seven hundred and fifty dollars. The Government's evidence relating to the Millsaps case was not irrelevant, and the conduct of Culp, Holland and Nance, as disclosed by the evidence relative to that case, was similar to their dealings with other "victims." The fact that evidence was received from "victims" other than those specifically named in the indictment did not affect the competency of that evidence. Overt acts not alleged in a con-

spiracy indictment may be proved upon a trial. Worthington v. United States, 7 Cir., 1 F.2d 154, 155. The Government was, of course, not required to plead all of its evidence in the indictment. Conspiracies can usually be proved only by showing what the conspirators did in execution of them. "Necessarily the existence of the conspiracy in most cases can be made to appear only inferentially from the acts of the parties committed in furtherance thereof." Feigenbutz v. United States, 8 Cir., 65 F.2d 122, 124. See also: Devoe v. United States, 8 Cir., 103 F.2d 584, 588, 589; Ryan v. United States, 8 Cir., 99 F.2d 864, 869; Galatas v. United States, 8 Cir., 80 F.2d 15, 22–24, and cases cited; Jelke v. United States, 7 Cir., 255 F. 264, 280, 281.

■■■ It is asserted by the appellants that the court erred in giving the following instruction to the jury: "Now in this case there are some issues that need give you no concern, and the Court instructs you as a matter of law that whatever was done in this case was done within the jurisdiction and venue of this Court, and within the period of the statutes of limitation, and that this Court has jurisdiction of the offense in this case, if one has been committed;" and in refusing to strike evidence of overt acts occurring more than three years before the indictment was returned. There is no merit in this assertion. The indictment alleged that the conspiracy continued from on or about January 1, 1937, to on or about January 1, 1941. The overt acts, evidence of which was objected to by the appellants, all occurred after the alleged commencement of the conspiracy. That there could have been no prosecution for a substantive offense charged as an overt act, because the statute of limitations had run, would not prevent the Government from showing the commission of the overt act in furtherance of the conspiracy or as indicating that the conspiracy commenced and continued as alleged in the indictment. Shaw v. United States, 5 Cir., 41 F.2d 26. Such a conspiracy as is charged in this indictment is a continuing one, and the statute of limitations does not commence to run against it until the last overt act leading to its accomplishment is committed. United States v. Kissel, 218 U.S. 601, 607, 608, 609, 610, 31 S.Ct. 124, 54 L.Ed. 1168; Brown v. Elliott, 225 U.S. 392, 400, 401, 32 S.Ct. 812, 56 L.Ed. 1136; Lonabaugh v. United States, 8 Cir., 179 F. 476, 478;

Breese v. United States, 4 Cir., 203 F. 824, 830; Shaw v. United States, supra, 41 F.2d page 27; Eldredge v. United States, 10 Cir., 62 F.2d 449, 450; compare Eaker v. United States, 10 Cir., 76 F.2d 267, 269. The last overt act alleged in the indictment and proved by the Government's evidence occurred in 1940. Therefore the conspiracy charged in the indictment was not barred by limitations. We have already ruled that the court had jurisdiction.

■ The appellants complain of the court's refusal to give twelve of the instructions requested by them. The requested instructions, so far as they were accurate and appropriate, were, in substance, included in the court's charge to the jury. We regard the instructions given by the court as entirely fair and adequate, and are satisfied that there was no prejudicial error committed in the denial of any of the appellants' requests for instructions.

■ The appellants contend that "the court erred in instructing the jury urging that they agree upon a verdict after the jury had disagreed for some hours." The record indicates that the case was submitted to the jury on January 26, 1942, and that on the following day they reported that they were unable to agree; that the court then delivered a supplemental charge, impressing upon the jurors the importance of agreeing upon a verdict, if possible. The supplemental charge was the usual charge given by trial courts to juries under such circumstances. See United States v. Allis, C.C., 73 F. 165, affirmed Allis v. United States, 155 U.S. 117, 15 S.Ct. 36, 39 L.Ed. 91. The supplemental instructions given by the court were entirely impartial. They contained no intimation as to what verdict should be rendered. No juror was asked to surrender his judgment or to violate his oath. The instructions were fair to the appellants and to the Government. Moreover, after the supplemental charge was given, the court's previous instructions were read to the jury. We are satisfied that the court did not abuse its discretion in giving the supplemental charge, and should be commended, rather than criticised, for doing so. The supplemental charge was nothing more than an earnest request to the jurors to attempt to reconcile their differences and to agree upon a verdict if they could conscientiously do so. Compare Allen v. United States, 164 U.S. 492, 17 S.Ct. 154,

41 L.Ed. 528; Boehm v. United States, 8 Cir., 123 F.2d 791, 812; Hewitt v. United States, 8 Cir., 110 F.2d 1, 10, certiorari denied 310 U.S. 641, 60 S.Ct. 1089, 84 L.Ed. 1409; United States v. McGuire, 2 Cir., 64 F.2d 485, 493; Dwyer v. United States, 2 Cir., 17 F.2d 696, 697, 698.

The judgments appealed from are affirmed.