UNITED STATES of America,
Appellee,

v.

John McCLEAN et al.,
Defendants-Appellants.

No. 430, Docket 75–1269.

United States Court of Appeals,
Second Circuit.

Argued Nov. 5, 1975.

Decided Jan. 13, 1976.

Patrick M. Wall, New York City, for defendants-appellants John McClean and Edward Codelia.

Victor J. Herwitz, New York City, for defendant-appellant Ramon Viera.

Edward R. Korman, Chief Asst. U. S. Atty. (David G. Trager, U. S. Atty. for the E. D. N. Y., Kenneth J. Kaplan, Asst. U. S. Atty., Brooklyn, N. Y., of counsel), for appellee.

Before MEDINA, ANDERSON and MANSFIELD, Circuit Judges.

MANSFIELD, Circuit Judge:

After a jury trial in the Eastern District of New York before Judge Jack B. Weinstein, the appellants, John McClean, Ramon Viera and Edward Codelia, three detectives attached to the Bureau of Narcotics, New York City Police Department, were on June 12, 1975, adjudged guilty of depriving certain individuals of their civil rights by unlawfully taking money and property from them without due process, 18 U.S.C. § 242 (3 counts), conspiracy to do so, 18 U.S.C. § 371 (1 count), and installation of illegal wiretaps in violation of 18 U.S.C. § 2511(1)(a) & (2) (2 counts).[1] The of-

---

1. 18 U.S.C. § 242 reads in pertinent part:

"Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any inhabitant of any State, Territory, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States . . . shall be fined not more than $1,000 or imprisoned not more than one year, or both . . . ."

18 U.S.C. § 371 outlaws conspiracies to "commit any offense against the United States, or to defraud the United States," and subjects each perpetrator to a fine not exceeding $10,000 and imprisonment not exceeding five years, or both.

In pertinent part, 18 U.S.C. § 2511(1)(a) forbids an individual, unless authorized by this

fenses all arose out of appellants' corrupt use of their positions as New York City law enforcement officers to extort and misappropriate money from suspected narcotics dealers.[2] Upon this appeal they jointly assert claims of errors frequently heard by us on criminal appeals: that certain counts failed to state a crime, that the evidence was insufficient, that the court erred in its instructions to the jury, that at most a series of separate conspiracies were proved instead of the single continuous conspiracy charged in the indictment, and that certain counts should have been dismissed pursuant to the Eastern District's Plan for Achieving Prompt Disposition of Criminal Cases. In addition Viera contends that his constitutional rights were violated by the government's failure to advise him of a possible conflict of interest on the part of his attorney. Finding no merit in any of these contentions, we affirm.

The evidence, viewed in the light most favorable to the government, as it must be at this stage, *United States v. Castellena*, 349 F.2d 264, 267 (2d Cir. 1965), *cert. denied*, 383 U.S. 928, 86 S.Ct. 934, 15 L.Ed.2d 847 (1966), reveals a sordid picture of police corruption, extortion and misconduct that appears to have permeated an important unit of the New York City Police Department. At a time when the public was becoming increasingly alarmed over the growing illicit narcotics traffic, with its harmful consequences in the City of New York, the Special Investigations Unit ("SIU" herein), charged with the duty of using the Police Department's powers and resources to investigate large-scale narcotics dealers and to arrest major violators,

became one of the most important branches of the Police Department's Bureau of Narcotics. During the period from 1969 to 1971 the SIU, headed by a bright young police captain, was divided into a series of teams, each composed of four to five policemen operating under an experienced senior who was in turn responsible to a sergeant. At some point in the late 1960's the members and leaders of these teams developed a loose partnership, sanctioned by the captain of the SIU, aimed at obtaining money for themselves unlawfully by using their police authority to shake down narcotics suspects and extort or steal money or property from them.

The extortionary plan was as simple as it was successful. Armed with the powers and weapons given to them for enforcement of laws prohibiting the narcotics trade, the team officers, upon learning through their undercover investigations (at least some of which were unlawful), that certain persons suspected of dealing in narcotics possessed or controlled large sums of money, would close in on the quarry and extract money by use of threats or force. A successful extortion was colloquially described as a "score," which would then be split up among the team members, with a share being paid over to the team's superiors. The extent to which the SIU was honeycombed with such corruption was evidenced by proof that during the period from 1969 to 1971 some $10,000 to $12,000 was paid to Captain Daniel Tange, the supervisory officer in charge of the SIU, and comparable amounts to team members, some of whom testified at trial to the pattern of extortion and seizure, the methods used and the parts played by various police officers.

chapter, from "willfully intercept[ing], endeavor[ing] to intercept, or procur[ing] any other person to intercept or endeavor to intercept, any wire or oral communication," subject to a fine of not more than $10,000, imprisonment not exceeding five years, or both.

2. McClean and Codelia were sentenced to one year imprisonment each on counts one through four, to run consecutively, five years on counts five and seven, to run concurrently with each other and consecutively with counts

one through four, and a fine of $10,000 on counts five and seven to run concurrently. Viera was sentenced to a term of imprisonment of one year on counts one through four, to run consecutively, five years on count five, to run consecutively with counts one through four, and a fine of $10,000 on count five. The sentence imposed was therefore a total of nine years in prison and a $10,000 fine for each defendant.

For present purposes it is unnecessary to detail the shake-downs in which appellants, who were members of one of the SIU teams, participated except to note some examples. In November 1970 one of the teams, which consisted of the three appellants and Detective Joseph Nunziata, learned through wiretaps unlawfully installed by them in an apartment building in Queens County that one apartment, No. 6Z, which had been leased to a former employee of the Mexican Embassy, was being used as a refuge by a Chilean narcotics dealer, Nicodemus Olate Romero ("Olate" herein), who controlled large sums of money. On November 19, 1970, McClean, Codelia and policeman Leslie Wolff, with guns drawn, forced their way into the one-room apartment where they held Olate at gunpoint and were joined by Viera and Police Lieutenant John Egan, who had in custody Mrs. Olate and an associate, Gusto Quintanilla, the latter in handcuffs. There followed a police ransacking of the type one would associate with the Gestapo or the Soviet GPU, including the slashing of coats and overturning of furniture, all of which yielded $17,500 in $50 and $100 bills plus several thousand dollars taken from the three persons in custody, a gun, a bag of cocaine and keys to a safe deposit box. After the bedlam had calmed down Codelia reached an agreement with Olate to the effect that if Olate paid the police $60,000, which would be obtained from Olate's safe deposit box, the members of the SIU team would give him his freedom. In order to maintain the appearance of a lawful narcotics search, Quintanilla was by agreement arrested under an alias and released on $2,000 bail. While members of the team kept custody of Olate, his wife withdrew $68,000 from his safe deposit box, of which $60,000 was retained by Codelia for himself and his cohorts. Arrangements were then made for departure from the United States of Olate and Quintanilla, who left for South America on November 21, 1970.

Not all shake-downs participated in by appellants were of such magnitude. However, when opportunities presented themselves appellants were content to extort or steal sums which, while modest by comparison with the Olate "score," were nevertheless quite substantial. For instance, on October 27, 1971, appellants' team, which now included a new member, Patrolman Luis Martinez, and operated under Sgt. Gabriel Stefania as supervisor, arrested a narcotics suspect, Ernest Solomon, and upon searching his apartment came across a leather bag containing a large sum of money which they promptly seized. However, instead of turning the full amount over to the Property Clerk at Police Headquarters the officers turned over only $4,125, which Solomon was required to acknowledge as the full amount seized by signing a voucher to that effect, a procedure designed to preclude his later claiming that the larger sum had been taken from him. The balance of the money taken by the officers, except for approximately $700 to $1,000 returned to Solomon, was kept by appellants.[3] In November, 1971, the same team, including appellants, learned as a result of installing an unlawful wiretap at the residence of John Grimke that Grimke and Vito Mirabile were high-level narcotics dealers. This discovery was followed by a search of the Grimke and Mirabile residences, in the course of which appellants broke into Mirabile's Cadillac, where they discovered an attache case containing heroin and approximately $20,000, which they promptly seized. Following essentially the same procedure as in the earlier arrest of Solomon, appellants returned $1,000 to Mirabile, turned in $9,485 to the Property Clerk, which was acknowledged as the full amount taken in a receipt signed by Mirabile, and kept the balance amounting to approximately $10,000 for themselves and their fellow teammates.[4]

This "score" was followed by an unsuccessful attempt by members of the team later in November, 1971, to close in

3. On the opening day of trial Solomon, who had been scheduled to testify as a witness for the United States, was murdered.

4. Mirabile, although subpoenaed by the government to testify at trial, disappeared and could not thereafter be located.

on another large-scale narcotics operator. The effort almost proved to be appellants' undoing when a New York Telephone Company security supervisor, acting on a call from a repairman, discovered unauthorized wiretap equipment that had been installed by Viera and Patrolman Martinez. The equipment was dismantled and turned over to the Kings County District Attorney's office. Following a meeting by McClean, Viera, Codelia and Martinez with an Assistant District Attorney to whom the matter had been referred, appellants apparently persuaded the Assistant to take no action in the matter.

On December 4, 1973, Olate, who had been the victim of appellants' November 1970 shake-down, was expelled from Chile and returned to the United States, where he was under indictment in the Eastern District of New York for narcotics violations. Some time thereafter he chose to cooperate with the government, leading to various indictments. On March 4, 1974, appellants were named in a four-count indictment in the Eastern District of New York (74 Cr. 180) charging them with conspiracy to defraud government agencies by failing to advise them of offenses and by comforting and assisting the offenders, with preventing the apprehension of narcotics violators by failing to turn over evidence of federal drug violations, and with obstructing communication of such violations to appropriate governmental agencies, all in violation of 18 U.S.C. §§ 3 and 1510 and 21 U.S.C. §§ 173 and 174. The indictment also charged them with illegal wiretapping, 18 U.S.C. § 2511(1)(a). On May 6, 1974, that indictment was dismissed on the government's motion and on November 22, 1974, the grand jury filed the indictment in the present case, upon which appellants were tried. It contained the six counts of which appellants were found guilty and one illegal wiretap charge (Count 6), of which they were acquitted.

## DISCUSSION

### The Sufficiency of the Evidence

Appellants' contention that the evidence was insufficient is directed, except for one argument on behalf of Viera, principally at the proof offered in support of Count 1 of the indictment, which charges a conspiracy on the part of the three appellants and various New York City policemen named as co-conspirators (Leslie Wolff, John Egan, Luis Martinez and Gabriel Stefania), beginning in June 1969, to deprive certain citizens (Solomon and Mirabile) and inhabitants of the State of New York (Solomon, Mirabile, Olate, Guzman and Quintanilla) of their rights under the Fifth and Fourteenth Amendments by using their powers as police officers to threaten and intimidate these persons, to take property from them without due process, and to arrest and deprive them of their liberty without due process, all in violation of 18 U.S.C. §§ 241, 242 and 371. Section 241 makes it an offense to conspire to injure, oppress, threaten or intimidate "any citizen" in the exercise or enjoyment of his constitutional rights. Section 242 makes it a crime for a person acting under color of law willfully to deprive "any inhabitant of any State" of any of his constitutional rights. Section 371 is the general conspiracy statute.

Appellants argue that the evidence failed to establish a violation of § 241 because at most it showed a simple state law violation of personal or property rights of the victims, such as larceny or acceptance of bribes in violation of New York's Penal Law, as distinguished from a conspiracy to deprive citizens of their constitutional rights, and that in the absence of a specific intent to prevent the victims from exercising *federal* rights no violation of § 242 was shown. As an added measure it is contended that since the money taken represented the proceeds of narcotics sales it was contraband and its seizure was therefore not protectable under the Due Process Clause.

 Since Judge Weinstein, in the interest of avoiding unnecessary complications for the jury, properly exercised his discretion to delete the charge of violation of § 241 from the conspiracy count, appellants' attack upon that charge amounts to nothing more than

the proverbial red herring and need not be considered. Turning to the charges based on §§ 242 and 371, the record reveals that appellants did not act in a private capacity, which might have precluded federal prosecution, but "under color of . . . law, statute, ordinance, regulation or custom," depriving persons of their property in violation of their Fourteenth Amendment rights, which fits squarely within the terms of those statutes. Indeed, to the extent that their conduct deprived any "citizen" (as distinguished from "any inhabitant of any State") of his Fourteenth Amendment rights, the conduct would also have constituted a violation of § 241. See *United States v. Guest*, 383 U.S. 745, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966). Proof of a specific intent on the part of the police officers to deprive persons of *federal* rights, rather than to engage in conduct having the effect of such deprivation, was unnecessary. The fact that they "may not have been thinking in constitutional terms is not material where their aim was not to enforce local law but to deprive a citizen of a right and that right was protected by the Constitution," *Screws v. United States*, 325 U.S. 91, 106, 65 S.Ct. 1031, 1037, 89 L.Ed. 1495 (1945); see also *Anderson v. United States*, 417 U.S. 211, 227, 94 S.Ct. 2253, 41 L.Ed.2d 20 (1974). It was sufficient to allege and prove that acting under color of their office appellants "willfully appropriated property from their victims without due process." Absent evidence of inadvertence, mistake, or that the property was taken for official rather than private use, the consequences of appellants' conduct must be deemed to have been intended. Judge Weinstein properly instructed the jury that if it found that each defendant knew and intended what he was doing and that his conduct deprived a person of his constitutional rights, it might conclude that the defendant acted with the "intention to deprive the victims of that constitutional right."

Appellants' reliance upon *United States v. Guest*, 383 U.S. 745, 760, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966), for the proposition that in order to establish a violation of federal law proof of a specific intent to violate a certain federal constitutional right must be adduced is inapposite. In *Guest* the Court noted that not "every criminal conspiracy affecting an individual's right of free interstate passage is within the sanction of 18 U.S.C. § 241." *Id.* at 760, 86 S.Ct. at 1179. For example, "a conspiracy to rob an interstate traveler would not, of itself, violate § 241," even though its incidental effect might be to interfere with his interstate travel. Hence the government must establish that "the predominant purpose of the conspiracy is to impede or prevent the exercise of the right of interstate travel." *Id.* The *Guest* Court did not suggest, as do appellants here, that a conspirator must think in federal constitutional terms, i. e., be aware that the freedom to travel is federally guaranteed, in order to produce a § 241 violation. Rather the Court required evidence of a specific intent to interfere with traveling because it faced an intrinsically ambiguous situation in which a robber might engage in criminal conduct occasioning at most an incidental interruption of the victim's traveling activities, an interruption that the robber did not seek or intend for its own sake. In contrast, the clear intention of the defendants in this case was to extort money from their victims under color of their state authority and without adhering to the processes due under the law. A plainer, less ambiguous violation of § 242 could not be found.

■ Nor can appellants escape the thrust of § 242 on the ground that the money and property extorted by them under color of their authority was contraband. Undoubtedly some of the property was indeed contraband. But there is nothing to show that the money taken by them in each case could properly have been traced and retained by the Police Department as evidence of drug offenses. For all we know some or all of the particular payments may have represented money lawfully acquired by the

persons from whom it was taken. In any event the victims were entitled to have the status of the seized property determined by due process. *McClendon v. Rosetti*, 460 F.2d 111 (2d Cir. 1972). By no stretch of the imagination were the police officers entitled unilaterally to decide that the money extorted by them was contraband and on that basis to keep it for themselves. In short, appellants' conduct fitted clearly within the express prohibitions of §§ 242 and 371 and was of a particularly heinous nature, similar to that prosecuted under § 242 in comparable cases. See, e. g., *United States v. Senak*, 477 F.2d 304 (7th Cir.), *cert. denied*, 414 U.S. 856, 94 S.Ct. 157, 38 L.Ed.2d 105 (1973); *Culp v. United States*, 131 F.2d 93, 98 (8th Cir. 1942).[5]

*Single Versus Multiple Conspiracies*

■ Appellants' next contention is that the "evidence negates the single-conspiracy theory and shows instead 'a series of independent discrete agreements.'" We disagree. Short of an express formal agreement between appellants, it is difficult to conceive of more convincing proof of one continuing conspiracy. The evidence established an understanding between appellants and their co-conspirators, extending to the very top of the SIU, to the effect that when an opportunity presented itself which would enable a team safely to shake down suspects or make an illegal seizure, they would take advantage of it, distributing the loot among themselves and their colleagues, including the chief of their unit. That this unlawful partnership was more than a mere evil inclination is attested to by the series of shake-downs and seizures participated in by appellants, which confirmed the on-going nature of their criminal venture. The proof here exceeded that found by us in chain narcotics conspiracy cases sufficient to establish one continuing agreement in spite of the loose-knit character of the understanding and the lack of acquaintanceship or communication among many participants. See, e. g., *United States v. Bynum*, 485 F.2d 490 (2d Cir. 1973), *vacated and remanded on other grounds*, 417 U.S. 903, 94 S.Ct. 2598, 41 L.Ed.2d 209 (1974); *United States v. Arroyo*, 494 F.2d 1316 (2d Cir.), *cert. denied*, 419 U.S. 827, 95 S.Ct. 46, 42 L.Ed.2d 51 (1974); *United States v. Sperling*, 506 F.2d 1323, 1340–43 (2d Cir. 1974). Here the evidence established a closely-knit group in which the participants knew each other and had one common aim, the use of their official positions to take property from victims without due process. Statements made by members of this joint criminal venture were properly admitted by the trial judge. See *United States v. Rinaldi*, 393 F.2d 97, 99 (2d Cir. 1968); *United States v. Annunziato*, 293 F.2d 373 (2d Cir.), *cert. denied*, 368 U.S. 919, 82 S.Ct. 240, 7 L.Ed.2d 134 (1961).

*The Sufficiency of the Illegal Wiretapping Counts*

■ Appellants next argue that the counts of the indictment charging illegal wiretapping in violation of 18 U.S.C. § 2511(1)(a) (Counts 5–7) should have been dismissed for lack of specificity, Rule 7(c), F.R.Cr.P., because they failed to furnish sufficient information as to "the nature of the illegality." The contention is that where a statute such as § 2511(1)(a) describes various different methods by which it may be violated, the indictment must state the specific means

5. Viera contends that his conviction under Count 5 of participating in the unlawful wiretap of a telephone at a certain Queens apartment should be reversed because Paul Stern, the superintendent of the building where the wiretap was located, did not identify Viera as one of the police officers seen by him in the room containing the wiretap equipment. The contention must be rejected, however, since the record contains ample evidence of Viera's involvement, including testimony by Stern regarding Viera's presence with McClean, Codelia and Nunziata in the lobby and their statement that they were conducting surveillance of Apt. 6Z, their use of the storage or meter room as a base of operations, and their entrance and exit from the room where tape recording equipment was installed. The managing agent of the building, Paul Sturm, placed Viera in the storage room. Viera, moreover, played a role in the shake-down of Olate as a result of the illegal wiretap.

alleged to have been used in the particular case. See *Russell v. United States*, 369 U.S. 749, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962). Here the challenged counts tracked the language of the statute, alleging that over a specified period of time and with respect to a telephone located at a specific address appellants "wilfully, knowingly and unlawfully did intercept and endeavor to intercept by means and use of an electronic device, that is a telephone wiretap, wire communications." This charge was plainly sufficient "to assure against double jeopardy and state the elements of the offense," *United States v. Tramunti*, 513 F.2d 1087, 1113 (2d Cir. 1975); *United States v. Cohen*, 518 F.2d 727, 732 (2d Cir. 1975). Recognizing that "particular facts needed in particular cases are obtainable by bills of particulars or discovery," Wright, Federal Practice and Procedure (Criminal) § 126 at 252, we have repeatedly refused, in the absence of any showing of prejudice, to dismiss similarly-couched charges for lack of specificity. See *United States v. Palmiotti*, 254 F.2d 491 (2d Cir. 1958); *United States v. Fortunato*, 402 F.2d 79, 81 (2d Cir. 1968), *cert. denied*, 394 U.S. 933, 89 S.Ct. 1205, 22 L.Ed.2d 463 (1969). Here there is no evidence of prejudice; furthermore, it appears that prior to trial particulars regarding the wiretaps were provided by the government to appellants. Thus the requirements designed to protect against double jeopardy and to enable defendants to prepare for trial were fully met.

*Russell v. United States*, 369 U.S. 749, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962), relied upon by appellants, is clearly distinguishable. In that case the indictment tracked the statutory language of 2 U.S.C. § 192, making it a crime for an individual summoned to testify before a congressional hearing to refuse to answer "any question pertinent to [the] question under inquiry." The Court made clear that it was not holding as a general rule that a conviction will be reversed where it is based on an indictment that has failed to list all of the

technical requirements of an offense. "Convictions are no longer reversed because of minor and technical deficiencies [in the charging papers] which did not prejudice the accused. This has been a salutary development in the criminal law." *Id.* at 763, 82 S.Ct. at 1046, citing *Smith v. United States*, 360 U.S. 1, 9, 79 S.Ct. 991, 3 L.Ed.2d 1041 (1959). But the Court concluded that the *Russell* indictment, by failing to specify the "question under [congressional] inquiry," omitted a key matter "central to every prosecution under the statute." *Id.* 369 U.S. at 764, 82 S.Ct. at 1047. Moreover the Court recalled the history of prosecutions under § 192 and repeatedly noted that where previous indictments had neglected to identify the topic under congressional inquiry, the criminal proceedings have been "infected" with "unfairness and uncertainty," *id.* at 766, 82 S.Ct. 1038, and both defendant and courts have often "found it difficult or impossible to ascertain what the subject was," *id.* 369 U.S. at 759, 82 S.Ct. at 1044; see also *id.* at 768–69, 82 S.Ct. 1038. In this case, appellants point to no comparable history of confusion, prejudice, or unfairness generated under 18 U.S.C. § 2511 when the indictment, as here, indicates the time period of illegal conduct and the specific telephone unlawfully tapped.

### *Viera's Claim of Denial of Counsel*

■ The only other point of significance is Viera's claim that his Sixth Amendment right to counsel was violated by the prosecutor's failure to advise him in advance of trial that the government would call as a witness a person who had previously been represented by Viera's counsel. The counsel, Robert Lazarus, Esq., had at an earlier time represented Joseph Calvo, a narcotics dealer, and his wife, following their arrest by McClean, Viera and Nunziata. Calvo having thereafter died, the government decided to call Mrs. Calvo as a witness to testify that upon the arrest of her husband, McClean, Viera and Nunziata had searched his apartment and seized approximately $20,000, which they kept after inducing Calvo to sign a voucher

indicating that they had only taken $320, his car keys and some jewelry. This testimony was relevant as proof of prior similar conduct indicating guilty knowledge and intent. See *United States v. Papadakis*, 510 F.2d 287, 294 (2d Cir.), *cert. denied*, 421 U.S. 950, 95 S.Ct. 1682, 44 L.Ed.2d 104 (1975).

██ Despite Mrs. Calvo's waiver of her attorney-client privilege and her acknowledgment that Lazarus, as counsel for Viera, would be obligated to cross-examine her vigorously, Lazarus contends that he was inhibited from doing so because of a fondness that he developed for her in the course of his representation of her and her husband. The effect, he argues, was to deny Viera his Sixth Amendment right to be represented by counsel of his own choosing since, if Viera had known before trial that the government was planning to call Calvo, he would have chosen someone else as his trial attorney. The contention borders on the frivolous.

The government would have been better advised, in view of its knowledge of Lazarus' prior representation of the Calvos, to have informed Viera of its intention to call Mrs. Calvo as a witness. However, in the absence of any showing of legally cognizable prejudice, its failure to do so hardly constituted an error of constitutional magnitude calling for a new trial. See *United States v. Alberti*, 470 F.2d 878, 880–81 (2d Cir. 1972), *cert. denied*, 411 U.S. 919, 93 S.Ct. 1557, 36 L.Ed.2d 311 (1973). Lazarus was not only chosen by Viera as his counsel but was free to cross-examine Mrs. Calvo vigorously without any inhibitions based upon the pre-existing attorney-client relationship since she had waived her attorney-client privilege and had consented to full cross-examination. At the very minimum Viera was obligated to indicate those areas which his counsel felt that he was inhibited from exploring on cross-examination. This he failed to do. His attorney's mere general statement that because of his concern for Mrs. Calvo

and her problems he could not fully cross-examine her hardly called for substitution of counsel, much less for a new trial.[6] A trial counsel worthy of the name should be capable of subordinating his personal predilections to his professional duty.

██ We have examined the other points raised by appellants and find them to be without merit. The argument that the indictment must be dismissed under Rule 4 of the Eastern District Prompt Disposition Rules because of the 5½ months delay between the dismissal of the first indictment and the filing of the second must be rejected, in view of our recent decision in *United States v. Flores*, 501 F.2d 1356 (2d Cir. 1974), holding that this period must be excluded in computing the time during which charges were pending since the defendants during that period were not subject to any of the disabilities of arrest, complaint or indictment.

The convictions are affirmed.

6. The Supreme Court's decision in *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), cited by Viera, which dealt with a defendant's right to represent himself, has no relevance to the issue.