Tino FIUMARA, Petitioner-Appellant,

v.

UNITED STATES of America, Respondent-Appellee.

No. 464, Docket 83–2260.

United States Court of Appeals, Second Circuit.

Argued Dec. 15, 1983.

Decided Jan. 26, 1984.

Certiorari Denied April 23, 1984. See 104 S.Ct. 2154.

James M. LaRossa, New York City (John W. Mitchell, Karen F. Silverman, LaRossa, Axenfeld & Mitchell, New York City), for petitioner-appellant.

Bruce A. Green, Asst. U.S. Atty., S.D. N.Y., New York City (Rudolph W. Giuliani, U.S. Atty., S.D.N.Y., Aaron R. Marcu, Barry A. Bohrer, Asst. U.S. Attys., New York City), for respondent-appellee.

Before FEINBERG, Chief Judge, and FRIENDLY and OAKES, Circuit Judges.

FRIENDLY, Circuit Judge:

Appellant Tino Fiumara was convicted in 1980 along with others, after an eleven week trial before Judge Sand and a jury in the District Court for the Southern District of New York, see *United States v. Clemente,* 494 F.Supp. 1310, of numerous offenses, including extortion in violation of the Hobbs Act, 18 U.S.C. § 1951, receiving bribes in violation of the Taft-Hartley Act,

29 U.S.C. § 186(b), conducting and conspiring to conduct an enterprise's affairs through a pattern of racketeering activity in violation of the Racketeer Influenced and Corrupt Organization Act (RICO), 18 U.S.C. §§ 1962(c) and (d), and filing false income tax returns in violation of 26 U.S.C. §§ 7201 and 7206(1). As said in our opinion affirming the convictions, *United States v. Clemente,* 640 F.2d 1069, 1071 (2 Cir.), *cert. denied,* 454 U.S. 820, 102 S.Ct. 102, 70 L.Ed.2d 91 (1981), the case concerned "racketeering activity that has plagued waterfront businesses in New York and New Jersey". A list of the seventy-four counts on which Fiumara was found guilty of and of the sentences imposed is appended to that opinion, *id.* at 1084. Fiumara's sentences to twenty-five years imprisonment and a $10,-000 fine on the RICO conspiracy counts and five years imprisonment and a $5,000 fine on the income tax counts, were imposed consecutively to a sentence of twenty years imprisonment and a $10,000 fine imposed in June 1979 by the District Court of New Jersey for extorting money from a restaurant owner by acts and threats of violence, *United States v. Fiumara,* No. 79–2385, *aff'd mem.,* 620 F.2d 290 (3 Cir.), *cert. denied,* 449 U.S. 832, 101 S.Ct. 100, 66 L.Ed.2d 36 (1980).

Represented by new counsel, Fiumara filed a motion in the district court under 28 U.S.C. § 2255 to have his convictions set aside. The motion, which was prepared in disregard of Rule 2(b) of the Rules Governing Section 2255 Proceedings,[1] alleged as grounds "Denial of effective assistance of counsel in that a conflict of interest existed between counsel, myself and a witness for the prosecution. See attached Statement of Facts—Point I" and "Denial of Effective Assistance of Counsel in that movant was convicted on evidence introduced in violation of 18 U.S.C. § 2517(5) and § 2515." Jt.App. at 5. The attached Statement of Facts extends in tiresome detail over twenty-three pages including many matters of which Fiumara could have no personal knowledge and which are unsupported by affidavits, and Point I of the memorandum incorporated in the motion consumes twenty-one pages and is studded with references to cases. Also Point II of the memorandum is not limited to the ineffective assistance of counsel in connection with the wiretap evidence alleged in the motion but asserts the violation as an affirmative ground, as does Fiumara's brief in this court. Choosing to overlook these procedural irregularities, Judge Sand denied the motion in a memorandum endorsement, and this appeal followed.

Fiumara's conflict of interest claim is an unusual one. A witness against Fiumara—not, as he alleged in the district court, the principal witness against him, see 494 F.Supp. at 1319–20 [2]—was Robert J. Delaney, a detective with the New Jersey State Police. Delaney's role at trial was to read the transcripts of telephone conversations obtained from wiretaps authorized by a New Jersey state judge for use in an unrelated joint investigation conducted by the New Jersey State Police and the FBI designated as "Project Alpha" which led to Fiumara's New Jersey conviction mentioned above and, in some instances, to interpret "code" language in them. Sometime during the winter of 1974–1975, Fiumara al-

---

1. This rule requires, with an exception not here pertinent, that the motion shall be in "substantially the form annexed to these rules". Paragraph 12 of the form says:

    State *concisely* every ground on which you claim that you are being held unlawfully. Summarize *briefly* the facts supporting each ground....
    (Emphasis in original).

    The portion of the form providing for the specification of grounds adds:

    Supporting FACTS (tell your story *briefly* without citing cases or law).

(Emphasis in original).

2. In his memorandum endorsement Judge Sand properly rejected this unfounded allegation, saying:

    Above all, [Fiumara] exaggerates the significance of Officer Delaney's testimony. It is simply not the case that this officer's testimony was the principle [sic] evidence against Fiumara.... [T]he evidence against Fiumara was overwhelming and the Delaney testimony ... cannot fairly be said to have played a major role at the trial.

legedly met a fashion model, Joann Schwab, who had been married to Pat Napitano. By the time of this meeting the Schwab-Napitano marriage had broken up, due in part of Napitano's incarceration, and proceedings had been instituted to dissolve it and to make provision for custody and visitation rights of their daughter, Danielle. The meeting allegedly led to a romantic relationship between Schwab and Fiumara which lasted for some six months.

In the course of the investigation that led to the New Jersey conviction mentioned above, Fiumara, on April 11, 1977, made the acquaintance of Delaney, then acting in an undercover capacity as Robert Covert. In a conversation between them and two others after dinner on a later occasion, the men began to talk about their relations with women, with Fiumara contributing an account of his liaison with Ms. Schwab. Covert seemed somewhat disturbed at the revelation. Later Fiumara learned from another man that, after the end of his affair with Schwab, Delaney had married her. When Fiumara "confronted Robert Delaney several times with the information" and mentioned Joann Schwab's name—just why is not explained—"Delaney became enraged". There were also allegations that Delaney was an extremely jealous and even violent husband.

At the trial in the district court Fiumara was represented by attorney Dennis McAlevy. When Fiumara engaged McAlevy, he asked the latter to recommend a lawyer to represent his co-defendant Michael Copolla. McAlevy recommended Joseph Hayden, Jr. The recommendation was accepted. Moreover, the memorandum incorporated in the motion alleges that

> [i]n addition, it was agreed between defendants (principally Mr. Fiumara and Mr. Copolla) that the motion practice and legal work would be handled essentially by Mr. Hayden, since Mr. McAlevy was confident of his abilities in this area, and that all submission[s] which were made to

the Court would be joint motions offered on behalf of both Mr. Fiumara and his co-defendant, Michael Copolla.[3]

Jt.App. at 19.

The memorandum goes on to assert that [f]or the purposes of the instant motion, the most important "joint decision" which was made involved the question of whether or not the government's witness Robert Delaney should be cross-examined concerning his bias against Mr. Fiumara as a result of his knowledge of the prior romantic relationship between his wife and movant[;]

that Fiumara discussed this with Hayden on several occasions; and that on one of these Fiumara pointed out to counsel that since Delaney was going to offer "subjective analysis" of the tapes from the New Jersey investigation, "cross-examination as to his bias and even his prior history of jealousy might very well convince the jury to reject his testimony"; but that "both counsel agreed that it would not be appropriate to cross-examine Office[r] Delaney on this issue." Jt.App. at 20, 21.

Now for the alleged conflict of interest. In 1977 Hayden had represented Ms. Schwab in a dispute with Napitano regarding the custody of their daughter Danielle. In 1979 Hayden again represented Ms. Schwab in a dispute over Danielle's custody, this time with Napitano's parents. The argument is that as a result of this representation Hayden had a duty to or may at least have formed a liking for Ms. Schwab; that public disclosure of her affair with Fiumara would be embarrassing to her and might even lead to a violent outbreak by Delaney; that Hayden thus had an ulterior motive for desiring that Delaney not be cross-examined with respect to the Schwab-Fiumara liaison; and that McAlevy, who did not disclose his knowledge of Hayden's representation of Ms. Schwab to Fiumara, simply rubber-stamped Hayden's decision.

It is by no means clear that even if Hayden rather than McAlevy had repre-

---

**3.** The memorandum added, "Indeed, as this Court may very well recall, Mr. Hayden was appointed 'lead counsel' by the Court in this case." Jt.App. at 20. Judge Sand's recollection and finding were to the contrary.

sented Fiumara, there would have been a conflict of interest. The motion does not allege except by innuendo that Hayden had ever represented Delaney, the witness to be cross-examined. Nothing suggests that his knowledge of Ms. Schwab's intimate relationship with Fiumara came as a result of a confidential communication from her; apparently he learned of this from either Fiumara or Delaney. The mere fact, if it be one, that he had come to like Ms. Schwab as a result of his representation, would not give rise to a conflict under this court's decision in *United States v. McClean*, 528 F.2d 1250, 1258 (2 Cir.1976), where we said:

> A trial counsel worthy of the name should be capable of subordinating his personal predilections to his professional duty.

Indeed, *McClean* would be *a fortiori,* since there the attorney had represented the witness—not, as here, the witness' wife.

■ However all this may be, Fiumara's lawyer was McAlevy, not Hayden. The lengthy memorandum incorporated in the § 2255 motion does not allege that McAlevy delegated to Hayden the decision whether or not to cross-examine Delaney in regard to Fiumara's affair with Schwab preceding her marriage to Delaney—a delegation that would have violated his professional duty. The most that can be eked out in Fiumara's favor is that Hayden participated in the conference at which it was decided not to cross-examine Delaney on the Schwab-Fiumara affair and that, for the reason indicated, his advice may not have been wholly disinterested, as McAlevy (although not Fiumara) knew. But the final decision rested with McAlevy and Fiumara, not with Hayden. There were the strongest tactical reasons not to press this line of attack. Its only hope of benefit was the possibility that Delaney would flare up, something that was hardly likely in the case of a trained police officer giving testimony in court, whatever his private reaction would be. Even if he did engage in a courtroom outburst, the jury might think it justified. On the more likely hypothesis that Delaney would retain his calm, the jury's reaction to Fiumara's dragging the name of a woman with whom he had been sexually intimate into a criminal trial, simply for purposes of impeachment, could have been extremely adverse.

Even in cases of multiple representation, "the possibility of conflict is insufficient to impugn a criminal conviction ... a defendant must establish that an actual conflict of interest affected his lawyer's performance." *Cuyler v. Sullivan,* 446 U.S. 335, 350, 100 S.Ct. 1708, 1719, 65 L.Ed.2d 333 (1980). Here McAlevy subjected Delaney to vigorous cross-examination; the strong likelihood is that introducing the subject of Fiumara's relations with the future Mrs. Delaney would have made his case even weaker than it was. In sum, Fiumara has failed to establish either that there was a conflict or that any conflict affected his lawyer's performance in any significant way.

As indicated, Fiumara's wiretap claim is now rested both on substantive grounds and on ineffective assistance of counsel, although only the latter was alleged in the § 2255 petition. The claim is based on 18 U.S.C. § 2517(5), which provides as follows:

> When an investigative or law enforcement officer, while engaged in intercepting wire or oral communications in the manner authorized herein, intercepts wire or oral communications relating to offenses other than those specified in the order of authorization or approval, the contents thereof, and evidence derived therefrom, may be disclosed or used as provided in subsections (1) and (2) of this section. Such contents and any evidence derived therefrom may be used under subsection (3) of this section when authorized or approved by a judge of competent jurisdiction where such judge finds on subsequent application that the contents were otherwise intercepted in accordance with the provisions of this chapter. Such application shall be made as soon as practicable.

In 1977, as part of the investigation by the New Jersey State Police referred to above, the police and one Patrick Kelly operated the Alamo Transportation Co. as

an undercover trucking operation. On June 28, 1977, New Jersey Superior Court Judge Schoch signed an order permitting interceptions of telephone conversations at the Alamo office in Jersey City, New Jersey. Among the conversations recorded were six conversations of three of Fiumara's co-conspirators in which they incriminated him.[4] In September 1979 Julian Wilsey, a New Jersey Deputy Attorney General, made an application to Judge Schoch. After referring to the judge's 1977 order, Wilsey stated that he had received a call from an Assistant United States Attorney for the Southern District of New York, in which the Assistant advised that he had learned that one of the tapes recorded as a result of the judge's interception order contained conversations helpful to the Government's case in *United States v. Clemente.* Wilsey sought permission to have the New Jersey State Police prepare a copy of the tape recording and transport the original to the office of the United States Attorney for the Southern District of New York, where a member of the FBI would take custody of it for the purposes of inspection by the defendants in *United States v. Clemente* and attempt to filter, enhance and copy the tape, whereupon the New Jersey State Police would transport the original back to New Jersey for resealing. Judge Schoch made an order dated September 27, 1979, accordingly. No objection to the use of the tape was made before or during the *Clemente* trial or on the appeal to this court.

Fiumara's claim is that Judge Schoch's 1979 order did not comply with 18 U.S.C. § 2517 as construed in *United States v. Marion,* 535 F.2d 697, 700 (2 Cir.1976), in that the order did not find that the wiretaps "were otherwise intercepted in accordance with the provisions of this chapter." The Government argues that the deficiency was merely formal and that the 1979 order was sufficient under the principle of implicit authorization recognized in *United States v. Tortorello,* 480 F.2d 764, 781–83 (2 Cir. 1973), *cert. denied,* 414 U.S. 866, 94 S.Ct. 63, 38 L.Ed.2d 86 (1974), in the portion of the

*Marion* opinion dealing with the "Lounge order", 535 F.2d at 703, and in *United States v. Masciarelli,* 558 F.2d 1064, 1068 (2 Cir.1977). Although we find substantial merit in this argument, we need not pass upon it since there are other sufficient reasons for rejecting Fiumara's claim.

■ The first is that Fiumara's objection is not cognizable under 28 U.S.C. § 2255 since it is neither jurisdictional nor constitutional in nature and does not constitute a "fundamental defect which inherently resulted in a complete miscarriage of justice." *Hill v. United States,* 368 U.S. 424, 428, 82 S.Ct. 468, 471, 7 L.Ed.2d 417 (1962). See *Wright v. United States,* 732 F.2d 1048 (2 Cir.1984). We have held that merely technical violations of ch. 119 of Title 18 do not rise to the *Hill* level and thus do not support collateral attack. *United States v. Wright,* 524 F.2d 1100, 1102 (2 Cir.1975) (wiretap applications had not been approved as required by 18 U.S.C. § 2516); *Alfano v. United States,* 555 F.2d 1128, 1130–31 (2 Cir.1977) (failure to seal wiretaps in violation of 18 U.S.C. § 2518(8)(a)).

■ A second reason is Fiumara's procedural default. Fed.R.Crim.P. 12(b)(3) requires that motions to suppress evidence must be made prior to trial and Fed.R. Crim.P. 12(f) provides that failure to make such a motion shall constitute a waiver, although the court for cause shown may grant relief from the waiver. Here there not only was no pretrial motion to suppress the New Jersey tapes, of which the defendants had full knowledge, there was no objection at trial or on appeal. This is a classic case for applying the rule of *United States v. Frady,* 456 U.S. 152, 168, 102 S.Ct. 1584, 1594, 71 L.Ed.2d 816 (1982), that a federal defendant seeking collateral relief despite procedural defaults—in this case three of them—must demonstrate "cause" excusing his defaults and "actual prejudice" resulting therefrom. Here there was no prejudice in the sense defined by the Court in *Frady.* The New Jersey tapes were only

---

**4.** These were the same transcripts that were   interpreted by Delaney.

a small part of the overwhelming proof against Fiumara; moreover, Fiumara has shown no reason to doubt that if the alleged defect in Judge Schoch's order had been pointed out before or even during trial, a correcting order could not have been readily obtained. There was likewise no showing of cause for the three-fold failure to object to the tapes. *Indiviglio v. United States,* 612 F.2d 624, 631 (2 Cir.1979), *cert. denied,* 445 U.S. 933, 100 S.Ct. 1326, 63 L.Ed.2d 768 (1980), negates Fiumara's contention that the mere fact of failure to make a claim for suppression demonstrates ineffective assistance of counsel, and Judge Mansfield's concurring opinion in *Indiviglio, id.* at 632, shows that this rule holds under the "reasonably competent assistance" of counsel standard recently adopted in *Trapnell v. United States,* 725 F.2d 149, 155, (2 Cir. 1983). Moreover, the decision not to object to the New Jersey tapes was the kind of joint decision supposedly dominated by Hayden, whose competence Fiumara has extolled in arguing the issue of the failure to cross-examine Delaney with respect to the Schwab affair.

Affirmed.