UNITED STATES of America, Plaintiff,

v.

James J. MICHALEK, Defendant.

No. 90–CR–159A.

United States District Court,
W.D. New York.

Feb. 12, 1993.

Marc Gromis, Asst. U.S. Atty. (Dennis C. Vacco, U.S. Atty., W.D.N.Y., of counsel), Buffalo, NY, for U.S.

Rodney Personius Brown and Kelly, Patrick J. Brown, LoTempio & Brown, Buffalo, NY, for defendant.

## DECISION AND ORDER

ARCARA, District Judge.

## INTRODUCTION

Presently before the Court is defendant James J. Michalek's motion for reconsideration of an Order of this Court dated October 30, 1992, [hereinafter "October Order"]. The Court held, in the October Order, that defendant had waived his right to file objections to the Presentence Report ("PSR") by failing to timely file such objections, and that even had he not waived the right, the amount of loss sustained by the victim banks was properly calculated in the PSR.

To the extent defendant's motion seeks reconsideration of the waiver issue and the calculation of the amount of loss, it is granted. However, the Court notes that defendant also attempts to use his motion for reconsideration to raise additional factual objections to the PSR. These additional objections not having been addressed in the October Order, the issue before the Court is not reconsideration, but rather, whether the recommendations in the PSR should be adopted.

Upon reconsideration, and after reviewing the submissions of the parties and hearing argument from counsel, the Court affirms its decision in the October Order that defendant waived his right to object to the PSR and that the amount of loss was properly calculated at over $2 million. Despite this finding, however, the Court has considered defendant's additional objections to the PSR, and after reviewing the submissions and hearing

argument, adopts the recommendations of the PSR *en toto.*[1]

## BACKGROUND

Defendant's motion for reconsideration and his objections to the PSR must be considered and understood in the context of this case's extensive and convoluted post-verdict procedural history. Defendant was charged with seven counts of submitting false statements to banks, (Counts I, II, III, IV, V, VI and VIII), and one count of mail fraud (Count VII). On December 20, 1991, following a five-week jury trial, defendant was found not guilty as to Counts I through IV, and guilty as to Counts V through VIII. Sentencing was scheduled for March 6, 1992, and defendant was released on a $10,000 signature bond over the government's objection.

On January 2, 1992, defendant and one of his court-appointed attorneys, Patrick J. Brown, Esq., met with the Probation Department for the purpose of providing information relevant to its preparation of the PSR. On January 24, 1992, at the government's request, the Court issued a warrant for defendant's arrest as a result of information from the government that defendant had failed to appear for state criminal proceedings, and information from the Probation Department and his attorneys that they had been unable to contact him. The government's information subsequently revealed that defendant had left the Western District of New York on January 10, 1992, on a USAir flight from Syracuse, New York to Baltimore, Maryland, and then to the Bahamas.

The Probation Department's preparation of the PSR was completed on February 11, 1992, and on February 14, 1992, copies were sent to the government and defense counsel, and to defendant at his last known address. Attached to the PSR sent to defendant and his attorneys was a copy of the Local Procedural Guidelines to Govern Sentencing Procedures under the Sentencing Reform Act of 1984 in the Western District of New York ("Local Guidelines"), and a cover sheet warn-ing of the possible implications of failing to timely comply with the Local Guidelines' objection requirements.

The Probation Department calculated defendant's offense level at 22 and his criminal history category at II, resulting in a guideline range of imprisonment of 46 to 57 months. In calculating defendant's offense level, Counts V through VIII were grouped pursuant to United States Sentencing Guidelines ("U.S.S.G.") § 3D1.2(d). A base offense level of 6 was given, pursuant to § 2F1.1(a), for crimes involving fraud and deceit. That base offense level was increased, pursuant to § 2F1.1(b)(1), based on the amount of loss involved. The Probation Department calculated the amount of loss at $2,208,000, which corresponded to a ten-level enhancement. § 2F1.1(b)(1)(K). Two-level upward adjustments were given for more than minimal planning pursuant to § 2F1.1(b)(2)(A); for defendant's role as organizer, leader, manager or supervisor in the criminal activity, pursuant to § 3B1.1(c); and for obstruction of justice pursuant to § 3C1.1, for a total offense level of 22.

On February 21, 1992, Mr. Brown filed a statement regarding sentencing factors in which he indicated that it was not possible to set forth whether or not any dispute existed with respect to sentencing factors or facts material to sentencing because he had been unable to discuss the PSR with defendant, his whereabouts being unknown to Mr. Brown. Item No. 67. On March 6, 1992, defendant failed to appear for sentencing. He was ultimately apprehended in the State of Wyoming on May 1, 1992.

On July 6, 1992, defendant filed a motion for an extension of time to dispute sentencing factors. Item No. 78. The motion incorporated by reference an earlier memorandum of law, dated June 18, 1992, which, in part, addressed defendant's request for an opportunity to object to the PSR. Item No. 74. The government filed an affidavit in opposition. Item No. 77. On July 7, 1992, the Court denied from the bench defendant's motion to file untimely objections to the PSR,

---

**1.** The Court's adoption of the recommendations contained in the PSR is based both on its determination that defendant waived the right to file objections to the PSR, as well as its explicit findings that defendant's objections are without merit.

finding that defendant had "fled the jurisdiction o[f] his own volition," and had therefore voluntarily waived his right to file objections to the report's factual findings. Nevertheless, the Court gave defendant an opportunity to supplement the record as to the amount of loss suffered by the victim banks.

On July 28 and 30, 1992, defendant submitted affidavits of himself and Mr. Brown, which focused on the issue of amount of loss. Item Nos. 80, 81. Defendant filed a supplemental affidavit of himself with exhibits on September 3, 1992, Item No. 96, and on September 23, 1992, filed a motion for a hearing on the amount of loss. Item No. 98. The government filed affidavits in opposition to defendant's motion for a hearing and in response to defendant's submissions. Item Nos. 99, 100. On October 16, 1992, defendant filed an amended statement with respect to sentencing factors that noted objections not only to the calculation of loss, but also to the enhancement for obstruction of justice, and the alleged duplication of enhancements for more than minimal planning and role in the offense. Item No. 104.

The Court filed the October Order on October 30, 1992, denying defendant's motion for a hearing on the amount of loss. The Court ruled that defendant had voluntarily waived his right to file objections to such factual findings of the PSR due to his failure to timely file any such objections. The Court also found that even had defendant not waived his right to object, the Court would have found, based on the affidavit and exhibits submitted by the government, that the amount of loss was in excess of $2,000,000. The Court adopted the recommendation of the Probation Department that defendant's offense level be calculated at level 22. Item No. 106.

On November 4, 1992, defendant filed the instant motion for reconsideration of the October Order, with accompanying memorandum of law. Item Nos. 109, 110. In addition to seeking reconsideration of the waiver issue and objecting to the PSR's calculation of loss, defendant asserts objections to the two-level upward adjustment for obstruction of justice; the two-level upward adjustment for more than minimal planning; the two-level upward

adjustment for role in the offense; and the grouping of Counts V and VI with Counts VII and VIII for purposes of sentencing.

On November 19, 1992, the government filed the affidavits of William P. Hessney, Esq., of Home and City Savings Bank ("Home and City"), and Gary F. Amendola, Esq., from Central Trust Company ("Central Trust"), on the issue of amount of loss. Item Nos. 111, 113. The government also filed an affidavit in opposition to defendant's motion for reconsideration. Item No. 112. Defendant filed a supplemental affirmation and reply memorandum on November 25, 1992. Item Nos. 114, 115.

The Court heard oral argument on defendant's motion for reconsideration and his factual objections to the PSR on December 10, 1992. Following oral argument, the government was allowed to respond to issues raised by defendant in his reply brief, and on December 24, 1992, filed a supplemental affidavit of Mr. Hessney and a supplemental affidavit in opposition to the motion. Item Nos. 118, 119. The defendant requested and was granted an opportunity to respond to new issues allegedly raised in the government's supplemental affidavit, and filed a supplemental reply brief on December 31, 1992. Item No. 122.

Such voluminous filings and seven postponements of sentencing over the course of five months, as noted in court records, resulted almost exclusively from defendant's insistence, despite the Court's rulings, that he did not and could not waive the right to file objections to the PSR simply by failing to file them within the time frame established by the Local Guidelines.

## DISCUSSION

I. *Defendant's Waiver of the Right to Raise Factual Objections to the PSR*

Defendant seeks reconsideration of the Court's October Order that, by failing to file objections to the PSR in a timely manner, he waived the right to object. Defendant's arguments are essentially two: (1) that the Local Guidelines are *per se* unconstitutional because the right to object to factual findings in a PSR cannot be waived simply by failing

to timely file such objections; and (2) even if the district court had discretion to set a ten-day filing requirement and provide that failure to comply with it constitutes waiver, defendant's due process rights were violated on the facts of this case because he was not on notice that failure to comply would result in waiver, and because any such waiver was not knowing or voluntary.

Upon reconsideration, and after reviewing the submissions of the parties and hearing argument from counsel, the Court affirms its prior ruling that defendant's failure to comply with the Local Guidelines constituted a waiver of his right to object to factual findings in the PSR.

### A. Constitutionality of the Local Guidelines

■ The authority of district courts to promulgate local procedural rules or guidelines derives from Fed.R.Crim.P. 57, which provides that a district court may make and amend rules governing its practice not inconsistent with the Federal Rules of Criminal Procedure.

The Local Guidelines, which were sent to defendant and his counsel, provide in relevant part that:

> 3. If a party reasonably disputes sentencing factors or facts material to sentencing, or seeks the inclusion of additional factors or facts material to sentencing in the PSR, it is the obligation of the complaining party to seek administrative resolution of such factors or facts through opposing counsel and the United States Probation Office prior to filing the pleading referenced in paragraph 4. This presentence conference is mandatory except when sentencing factors or facts are not in dispute. No party may file a written objection to the PSR ... unless he [or she] has conferred with the United States Probation Office and his [or her] opponent in a good faith effort to resolve the disputed matter.
>
> 4. No later than ten (10) days prior to the sentencing hearing, counsel for the defendant and the Government shall file a pleading entitled, "Statement of Parties With Respect to Sentencing Factors," in

accordance with Section 6A1.2 of the *Sentencing Guidelines* .... If a party challenges the findings or factors in the PSR, he [or she] must state with particularity the basis for the objection to the PSR....

The cover sheet attached to the copy of the Local Guidelines contained a warning in capital letters and bold type:

### WARNING

FAILURE TO COMPLY WITH THE LOCAL PROCEDURAL GUIDELINES MAY RESULT IN THE COURT DECLINING TO CONSIDER ANY OBJECTIONS TO THE APPLICATION OF THE SENTENCING GUIDELINES AS CONTAINED IN THE PRESENTENCE REPORT. YOU HAVE TEN (10) DAYS WITHIN WHICH OBJECTIONS MUST BE MADE KNOWN.

*See* Item No. 112, Exhibit A.

Defendant asserts that the Local Guidelines are in contravention of Fed.R.Crim.P. 32(c)(3)(A) and U.S.S.G. § 6A1.3, such that they are *per se* unconstitutional. Fed. R.Crim.P. 32(c)(3)(A) provides that:

> [a]t least 10 days before imposing sentence, unless this minimum is waived by the defendant, the court shall provide the defendant and the defendant's counsel with a copy of the report of the presentence investigation.... The court shall afford the defendant and the defendant's counsel an opportunity to comment on the report and, in the discretion of the court, to introduce testimony or other information relating to any alleged factual inaccuracy contained in it.

Rule 32(c)(3)(D), provides that:

> [i]f the comments of the defendant and the defendant's counsel or testimony or other information introduced by them allege any factual inaccuracy in the presentence investigation report ... the court shall, as to each matter controverted, make (i) a finding as to the allegation, or (ii) a determination that no such finding is necessary because the matter controverted will not be taken into account in sentencing.

Section 6A1.3 of the Sentencing Guidelines is to the same effect, and references Rule 32.

The Court finds that the Local Guidelines [2] are not in derogation of or inconsistent with Fed.R.Crim.P. 32(c)(3) or U.S.S.G. § 6A1.3, but rather, are a means of ensuring efficient compliance therewith. The Local Guidelines were drafted and adopted by the judges of the Western District of New York on March 1, 1988, based on the recognized need for the court to provide for the efficient resolution and disposition of objections to the PSR such that defendants can be sentenced in a timely manner. The imposition of a ten-day rule for filing such objections is a reasonable procedure devised by the District judges to ensure such goals.

■ The Local Guidelines establish a time frame for the exercise of the due process rights recognized in Rule 32(c)(3). To find, as defendant suggests, that failure to comply with the Local Guidelines cannot result in waiver of these rights, would render the Local Guidelines ineffective; enforcement impossible; and non-compliance meaningless. In effect, a defendant could indefinitely put off his or her sentencing by strategically filing factual objections over a period of time. Defendant had the opportunity to present his objections through the regular procedures established by the Local Guidelines in compliance with Fed.R.Crim.P. 32(c)(3)(A). Had he done so, he would have been afforded an opportunity to be heard and the Court would have been required to resolve the objections prior to sentencing. However, because defendant did not place his objections before the Court by timely filing them, the provisions of Rule 32(c)(3) are not applicable. Nevertheless, defendant was, despite the Court's finding of waiver, given an opportunity to supplement the record on his factual objections which, at the time, focused mainly on the issue of amount of loss.

■ Defendant cites *United States v. Edwards,* 945 F.2d 1387, 1404 (7th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1590, 118 L.Ed.2d 308 (1992), in which the Seventh Circuit held that "[f]leeing the jurisdiction may subject a defendant to a host of additional penalties, but an inadequate amount of time to review a PS[R] is not one of them." The circuit court ordered that defendant be resentenced and that he be given ten days, pursuant to Rule 32(c)(3)(A), to review the PSR. Defendant here interprets this holding to mean, by implication, that fleeing the jurisdiction also cannot result in waiver of the right to raise factual objections to the PSR.

Without analyzing defendant's interpretation, the Court notes that *Edwards* is distinguishable from the instant case because the court there relied only on Rule 32(c)(3)(A), which simply provides that defendants are to receive a copy of the PSR at least ten days prior to imposing sentence, and that the court is to "afford the defendant ... an opportunity" to raise factual objections to the PSR. The district court in *Edwards* did not appear, as here, to have a Local Rule or Local Guidelines regarding sentencing and PSRs, which specifically provided that objections to the PSR be raised within ten days of receipt thereof, and that failure to comply with the ten-day rule would result in waiver of the right to file such objections. As such, the circuit court in *Edwards* was only concerned that defendant be afforded an opportunity to review the PSR as required by Rule 32(c)(3)(A), and did not address the issue of whether a district court's promulgation of a Local Guideline, which provides for waiver of rights under Rule 32(c)(3)(A) based on non-compliance with a filing requirement violates defendant's right to due process. The Court finds that although Rule 32(c)(3) does not provide for waiver based on untimely filing of objections, the Local Guidelines' waiver rule constitutes a reasonable exercise of the court's supervisory powers in the promotion of the efficient use of judicial resources regarding sentencing, and is not impermissibly inconsistent with the Federal Rules.

■ Defendant asserts that the Court's enforcement of the Local Guidelines' filing requirement denies him his statutory right to a fair sentence in violation of the Due Pro-

---

**2.** References to the Local Guidelines are to the cover sheet as well as the actual text of the Guidelines.

cess Clause. However, defendant's right was not denied; it was "merely conditioned upon the filing of a piece of paper.... '[T]he [court] certainly accords *due* process when it terminates a claim for failure to comply with a reasonable procedural or evidentiary rule.'" *Thomas v. Arn*, 474 U.S. 140, 155, 106 S.Ct. 466, 475, 88 L.Ed.2d 435 (1985) (quoting *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 437, 102 S.Ct. 1148, 1158, 71 L.Ed.2d 265 (1982)) (referring to Sixth Circuit rule that failure to file objections to a Magistrate Judge's report and recommendation within ten days results in waiver of the right to raise that issue on appeal). Defendants subject to the ten-day waiver rule for filing objections to the PSR are afforded "'an *opportunity* ... granted at a meaningful time and in a meaningful manner,'" to file objections and have those objections considered by the district court. *Id.* (quoting *Logan*, 455 U.S. at 437, 102 S.Ct. at 1158 (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965))). The implications of defendant's failure to comply with the provisions of the Local Guidelines do not, therefore, offend the dictates of due process.

■ While courts have not specifically addressed whether a defendant waives his or her due process right to present and be heard on factual objections to a PSR by failing to raise the objections in compliance with filing deadlines, courts in other contexts have recognized that fundamental constitutional rights can be waived by failure to comply with such reasonable procedural rules.

It is well established, for example, that constitutional rights and claims under the Fourth, Fifth and Sixth Amendments are deemed waived by failing to raise them in a suppression motion within the time frame established by the court. Fed.R.Crim.P. 12(b)(3) specifically provides that motions to suppress evidence must be raised prior to trial. Subdivision (c) of Rule 12 provides that "[u]nless otherwise provided by local rule, the court may, at the time of the arraignment or as soon thereafter as practicable, set a time for the making of pretrial motions or requests...." Subdivision (f) provides that:

> [f]ailure by a party to raise defenses or objections or to make requests which must be made prior to trial, at the time set by the court pursuant to subdivision (c), or prior to any extension thereof made by the court, *shall* constitute waiver thereof, but the court for cause shown may grant relief from the waiver.

(emphasis added).

■ While the court can, upon an adequate showing by defendant, grant relief from the waiver for cause shown, this is done only rarely. *See* 1 Charles A. Wright, Federal Practice and Procedure § 193, at 698 (1982); *United States v. Mangieri*, 694 F.2d 1270, 1283 (D.C.Cir.1982).

■ The mandatory waiver provided for under Rule 12(b)(3) and (f) applies whatever may be the claimed basis for the application of the exclusionary rule, including claims that evidence was obtained as a result of an illegal search and seizure under the Fourth Amendment; or as a result of a confession obtained in violation of the Fifth Amendment privilege against self-incrimination or the Sixth Amendment right to counsel. 1 Charles A. Wright, Federal Practice and Procedure § 193, at 704, 704 n. 37. *See, e.g., Fiumara v. United States*, 727 F.2d 209, 213 (2d Cir.) (failure to raise alleged illegality of wiretap in suppression motion waived the objection), *cert. denied*, 466 U.S. 951, 104 S.Ct. 2154, 80 L.Ed.2d 540 (1984); *United States v. Hart*, 729 F.2d 662, 665 (10th Cir.1984) (claim that confession was obtained in violation of *Miranda* was waived by failure to make motion to suppress prior to trial), *cert. denied*, 469 U.S. 1161, 105 S.Ct. 914, 83 L.Ed.2d 927 (1985); *United States v. Schwartz*, 535 F.2d 160, 163 (2d Cir.1976) (failure to raise, in pretrial suppression motion, claim that there was no probable cause for warrant and that the Fifth Amendment privilege against self-incrimination was violated, operated as waiver of right to challenge the subsequent admission of evidence on that ground), *cert. denied*, 430 U.S. 906, 97 S.Ct. 1175, 51 L.Ed.2d 581 (1977).

■ Thus, it is clear that the Fourth Amendment right to be free from unreasonable searches and seizures, the Fifth Amendment privilege against self-incrimination and the Sixth Amendment right to counsel are all fundamental constitutional rights which, by statute, are waived by reason of defendant's failure to raise them within the time frame established by the trial court. These rights are no less important than the due process right to raise and be heard on factual objections to a PSR prior to sentencing. The explicit waiver provision in Fed.R.Crim.P. 12(b)(3) and (f) supports a finding that the waiver provision under the Local Guidelines is not *per se* unconstitutional.

■ In the context of sentencing, the Court notes that a defendant's failure to raise a factual objection to the PSR prior to sentencing waives his or her right to raise that objection on appeal. *United States v. Jackson*, 974 F.2d 57, 60 (7th Cir.1992). A finding of waiver is mandated even where defendant asserts that the PSR's recommendations are based on factual inaccuracies.[3]

■ While the defendant in *Jackson* was actually sentenced without having raised the factual objections, the reality in terms of due process is the same as the instant case where defendant attempted to raise objections prior to sentencing but outside the ten-day time limit. Both failures result in waiver of the right to pursue the objections whether before the district court or the court of appeals. *See also United States v. Thomas–Hamilton*, 907 F.2d 282, 284 (2d Cir.1990) (in the absence of "manifest injustice," defendant is precluded on appeal from raising objection to obstruction of justice enhancement which was not presented to the court below); *Knight v. United States*, 611 F.2d 918, 922 (1st Cir.1979) (where defendant fails to object to contents of PSR at time of sentencing hearing, postconviction relief is generally not available, despite sentencing court's reliance on a "material misapprehension of fact").

Given the Court's finding that the Local Guidelines are not inconsistent with Fed.

R.Crim.P. 32(c)(3), and given that, with regard to other fundamental constitutional rights, courts have held that waiver results from noncompliance with reasonable procedural requirements such as filing deadlines, the Court finds that the waiver provision of the Local Guidelines is not *per se* unconstitutional and does not *per se* violate the Fifth Amendment right to due process of law.

B. Specific Objections to Finding that Defendant Waived Right to Raise Factual Objections to the PSR by Failing to Comply with the Local Guidelines

■ Even if the Local Guidelines are not *per se* unconstitutional, defendant contends that he did not waive the right to raise factual objections to the PSR because: (1) he was not on notice that the failure to file such objections within ten days of receipt of the PSR could potentially result in waiver of the right to raise such objections; and (2) any such waiver of the right to raise factual objections was not knowing and voluntary.

1. *Lack of Notice.* Defendant contends that he was not on notice that failure to file objections to the PSR within ten days of receipt thereof could result in waiver of the right to assert such objections. Defendant points to the fact that Fed.R.Crim.P. 32(c)(3)(A) does not provide for waiver based on failure to raise objections, and that the text of the Local Guidelines does not specifically provide that failure to file objections within the ten-day period will result in waiver of the right to object.

The waiver of important rights has been upheld even where the statute and local rules in question do not specifically provide for such waiver. In the context of objections to magistrate judges' reports and recommendations under 28 U.S.C. § 636(b) and Fed. R.Civ.P. 72(b), for example, the Supreme Court has upheld the constitutionality of a court-made rule that failure to file objections to the report and recommendation within ten days of receipt results in waiver of the right to raise such issues on appeal even though the statute and federal rule do not provide

---

**3.** The Court of Appeals can, pursuant to Fed. R.Crim.P. 52(b), correct plain error despite de-

fendant's failure to timely object.

for such waiver. *Arn*, 474 U.S. 140, 106 S.Ct. 466; *see also Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir.1988).

Such analysis notwithstanding, the Court finds that here, defendant was put on specific notice by the cover letter that accompanied the PSR and Local Guidelines sent to him, that failure to file objections to the PSR within ten days could result in the court's refusal to consider such objections. Defendant was warned in unambiguous terms of the possible consequences of failure to file. The fact that the warning was permissive as opposed to mandatory is irrelevant—defendant cannot base his failure to timely file objections on a facile argument that he was only told that he may be waiving his right to object.

■■■ Defendant asserts that he cannot be held to have had notice of the Local Guidelines' waiver rule because he did not receive a copy of the PSR with the attached Local Guidelines until he was returned to the jurisdiction in May 1992, and, in addition, because the Court never made a finding as to when the ten days began to run. This argument does not warrant serious consideration.

A copy of the PSR and Local Guidelines was delivered to defendant at his last known address and to both of his assigned counsel on February 14, 1992. Whether or not defendant actually physically received the PSR due to his absence from the jurisdiction is immaterial. A defendant on bail pending sentencing has the obligation to keep the court informed of his or her whereabouts. Defendant cannot shift that responsibility to the Court and require the Court to track him down in order to ensure that he personally received the PSR and Local Guidelines. In addition, the Local Guidelines provide that it shall be the responsibility of defense counsel to ensure disclosure of the PSR to the defendant. Defendant's attorneys received the PSR on February 14, 1992, and the ten days began running from then. The sole reason they were unable to ensure disclosure of the PSR to defendant was defendant's absence from the jurisdiction. Indeed, defendant's counsel filed a statement within the ten-day period to the effect that they could not set forth whether or not there were any objec-

tions to the PSR because defendant's whereabouts were unknown to them. Item No. 67.

Thus, the Court finds that defendant had notice of the ten-day filing requirement and of the possibility of waiver. To hold otherwise would allow him to benefit from his own wrongdoing in leaving the jurisdiction without permission of the Court.

■■■ 2. *Waiver was not Knowing and Voluntary.* Finally, defendant contends that he cannot be found to have waived his right to raise factual objections to the PSR because any such waiver was not knowing and voluntary. The Court is not persuaded, however, that the waiver of a right due to noncompliance with a filing deadline requires a finding that the waiver was knowing and voluntary. As previously discussed in the context of waiver of constitutional rights under Fed.R.Crim.P. 12, failure to raise alleged violations of Fourth, Fifth and Sixth Amendment rights in a suppression motion prior to trial waives the right to raise such objections at trial or on appeal. Relief from the waiver can be granted "for cause shown." Fed. R.Crim.P. 12(f).

■■■ It has been noted that while "[n]oncompliance with the[ ] [filing requirements under Fed.R.Crim.P. 12(b)(3) and (f) ] is commonly characterized as a 'waiver' of the constitutional objection,.... because such a failure does not ordinarily involve an intentional relinquishment of a constitutional right it is better to view it as a 'forfeiture.' " 1 Wayne R. LaFave & Jerold H. Israel, Criminal Procedure, § 10.2, at 783. Under this analysis, the waiver of the right to raise objections to the PSR due to failure to comply with the filing deadline is more like a forfeiture than a waiver in that it too does not necessarily involve an intentional relinquishment of the due process right. Where a defendant waives a right by failing to comply with a filing deadline, as opposed to making a conscious decision to do so, the Court may not be required to determine whether he or she knowingly and voluntarily waived the right, but rather, only whether the waiver should be relieved for cause shown.

■ Defendant here has not satisfied his burden of establishing any cause for his failure to file objections within the prescribed period of time. Defendant's attorneys, in their motion to extend the time to file objections, merely indicated that defendant was "unfortunately" not available to counsel at the time the PSR was made available and for that reason, it was not possible to review it with him. Item No. 78. Defendant's leaving the jurisdiction while on bail pending sentence—in contravention of the Court's order—does not constitute cause shown for relieving defendant's waiver or forfeiture.

■ Further, the Court finds that defendant's waiver of the right to file factual objections to the PSR would also be knowing and voluntary, based on the record. Indeed, a finding of knowing and voluntary waiver is almost compelled by the facts of this case. Defendant was an attorney with experience in federal court. He had met with the Probation Department on January 2, 1992. It is inconceivable that he did not know that a PSR was going to be prepared; that he would be given an opportunity to review the PSR; or that any objections to the PSR would have to be filed in accordance with some temporal procedural strictures. Moreover, the Probation Officer submitted a memorandum that seriously controverts defendant's claim that he lacked knowledge as to his further responsibilities regarding the preparation of the PSR. *See infra* at 271. "[D]efendant's initial presence [at the January 2, 1992 meeting with probation] serves to assure than any waiver [was] indeed knowing." *Crosby v. United States,* — U.S. ——, ——, 113 S.Ct. 748, 752, 122 L.Ed.2d 25 (1993) (a defendant's mid-trial flight would constitute a knowing and voluntary waiver of the right to be present at trial).

■ Defendant argues that the Court's prior findings on the record and in its October 23, 1992 Recusal Decision and Order that he was voluntarily absent from the jurisdiction, cannot be the basis for finding that he

knowingly and voluntarily waived his right to file factual objections to the PSR. The Court disagrees. While the Court's finding of waiver does not depend on the fact that defendant absconded; such absconding is evidence that defendant's failure to timely file was knowing and voluntary. Defendant's purported ignorance of the waiver provision of the Local Guidelines is largely attributable to his absence from the jurisdiction. In previously determining that defendant voluntarily waived the right to object to the PSR, the Court found that defendant had not been unavailable based on excusable conduct, but rather, had voluntarily chosen to be unavailable. Although the Court did not specifically state that defendant's waiver was knowing as well as voluntary, such a finding was implicit in its statements on the record, its Recusal Decision and Order, Item No. 105, and the October Order.

Thus, upon reconsideration, and for all of the reasons stated, the Court affirms its decision that defendant forfeited or waived the right to file objections to the PSR by failing to file such objections within the ten-day time period established by the Local Guidelines.

## II. *Defendant's Substantive Objections to the PSR*

■ Having found that defendant forfeited or waived the right to raise factual objections to the PSR, the Court need not address defendant's factual objections. However, because the Court has allowed defendant to supplement the record regarding his objections, and in order for there to be a complete record on appeal,[4] the Court has addressed those objections, which relate to: (1) the amount of loss sustained by the victim banks; (2) obstruction of justice; (3) more than minimal planning; (4) aggravated role in the offense; and (5) the grouping of Counts V and VI with Counts VII and VIII for purposes of sentencing.

### A. Amount of Loss Sustained by the Victim Banks

■ Counts V and VI involved a $2.1 million loan from Central Trust, in connec-

---

**4.** To the extent that defendant's motion seeks reconsideration of the Court's denial of his request for a hearing on contested factual findings, the Court notes that there is no right to a mandatory evidentiary sentencing hearing, *United States v. Pugliese,* 805 F.2d 1117, 1123 (2d Cir. 1986), and that defendant has been provided an ample opportunity to supplement the record.

tion with Tremont Mall. Counts VII and VIII involved a $3.1 million loan from Home and City in connection with the Oakwood Apartment Complex. The PSR calculated the amount of actual loss sustained by these banks at over $2 million, and recommended a ten-level upward adjustment pursuant to § 2F1.1(b)(1)(K).[5] Defendant asserts that neither bank suffered any loss for purposes of the Sentencing Guidelines and that there should be no enhancement of the base offense level of 6. The government contends that the PSR calculation is correct—that affidavits of attorneys for the banks with supporting documentation establish by a preponderance of the evidence that Central Trust suffered an actual loss of $1,860,183.53, and Home and City, an actual loss of $ 204,604.55, for a combined loss of $2,064,788.08. After carefully reviewing all the submissions and the arguments of counsel, the Court finds that the amount of actual loss suffered by Central Trust and Home and City was properly calculated at over $2 million.

 The calculation of loss under § 2F1.1(b)(1) is governed by the principle that the calculation need not be precise:

The court is not expected to identify each victim and the loss he [or she] suffered to arrive at an exact figure. The court need only make a reasonable estimate of the range of loss, given the available information. The estimate may be based on the approximate number of victims and an estimate of the average loss to each victim,

or on more general factors, such as the nature and duration of the fraud and the revenues generated by similar operations.

Application Note 8, 1987 Guidelines. The 1992 Guidelines, which the Court may look to to help clarify the Commission's initial intent, *see United States v. Scroggins*, 880 F.2d 1204, 1215 (11th Cir.1989) (in interpreting Guidelines, courts should consider even subsequently amended commentary because in most cases, the "amendments do not effect a substantive change, but rather are intended only to clarify the rule adopted by a particular guideline.), *cert. denied*, 494 U.S. 1083, 110 S.Ct. 1816, 108 L.Ed.2d 946 (1990); *United States v. Schular*, 907 F.2d 294, 297 (2d Cir.1990), provide that "the loss need not be determined with precision. The court need only make a reasonable estimate of the loss, given the available information." Application Note 8.[6] In addition, the Commentary to § 6A1.3 provides that: "[i]n determining the relevant facts, sentencing judges are not restricted to information that would be admissible at trial. Any information may be considered, so long as it has 'sufficient indicia of reliability to support its probable accuracy.'" (citations omitted).

 The amount of actual loss is "the amount of the loan not repaid at the time the offense is discovered, reduced by the amount the lending institution has recovered (or can expect to recover) from any assets pledged to secure the loan." 1992 Guidelines, § 2F1.1,

---

5. As a general principle, the Guidelines Manual in effect at the time of sentencing is to be used in preparing the PSR. However, where the Manual in effect at the time the offenses of conviction were committed is more beneficial to the defendant, it is to be used. *See* 1992 Guidelines, § 1B1.11. Here, the Guidelines Manual in effect at the time the offenses were committed, the 1987 Manual, was more beneficial than the 1991 Guidelines Manual which was in effect at the time the PSR was prepared, as well as the 1992 Guidelines Manual which, because of the delay in sentencing, is currently in effect. Under both the 1991 and 1992 Guidelines, defendant's offense level would have been enhanced by eleven rather than ten levels for an amount of loss in excess of $2 million. Thus, the Probation Department used the 1987 Guidelines Manual.

The 1987 Guidelines provide that the amount of *potential* loss is to be used in calculating loss under § 2F1.1(b)(1). Application Note 7; *see*

*also United States v. Brach*, 942 F.2d 141 (2d Cir.1991) ("loss" within meaning of Sentencing Guideline was face value of $250,000 loan obtained by wire fraud). The 1992 Guidelines provide that the amount of *actual* loss is to be used. Application Note 7(b). Here, although the Probation Department used 1987 guideline ranges, it applied the 1992 Application Note and calculated actual rather than potential loss. This benefitted defendant because the potential loss to the banks was $5.2 million—the face value of the loans— which would have resulted in an enhancement of eleven levels pursuant to § 2F1.1(b)(1)(L).

6. Application Note 7 of § 2F1.1 of both the 1987 and 1992 Guidelines also references the Commentary to § 2B1.1 (Larceny, Embezzlement, and Other Forms of Theft), which Commentary provides that: "loss need not be determined with precision, and may be inferred from any reasonably reliable information available...." § 2B1.1, Application Note 3.

Application Note 7(b). Defendant's calculations of loss, however, are based on notions of loss, deficiency and liability borrowed from bankruptcy law and New York real property law. His arguments are based on specific proceedings in bankruptcy court and particular events and conversations surrounding the foreclosures of the properties underlying the loans. The Court finds that bankruptcy and New York law are not relevant to the calculation of loss under the Sentencing Guidelines. What happens civilly regarding loss has absolutely no bearing on loss for purposes of sentencing, and defendant has offered no legal authority that would suggest otherwise. The calculation of the actual amount of loss sustained by the victim banks under the Sentencing Guidelines is unaffected by the banks' ability or inability to recover the actual sums lost. In addition, the Court need not rehash the entire bankruptcy and foreclosure proceedings in this case in order to properly determine the amount of loss sustained for purposes of sentencing.

■ 1. *Central Trust Bank.* The loss attributable to Central Trust is $1,860,183.53 dollars. The letter and affidavit of Gary F. Amendola, Esq., attorney for Central Trust, Item Nos. 100, Exhibit C; 113, indicate that at the time of the foreclosure sale, Central Trust had incurred a loss of $2,510,183.53. This figure represented unpaid principal, accrued interest, late charges and a prepayment fee. *Id.*

On March 12, 1990, a foreclosure sale was held. Central Trust was the only bidder. It had previously agreed to bid $2.1 for the property and abided by that agreement at the sale.[7] By order of New York State Supreme Court Justice Leo J. Fallon, dated October 3, 1990, a deficiency judgment was awarded to Central Trust in the amount of $411,535.65—the difference between the amount owed the bank, approximately $2.5 million, and the amount of its bid, approximately $2.1 million. Item No. 100, Exhibit C. In August 1991, Central Trust resold the property for $650,000, Item No. 113, ¶ 5, suffering an additional loss of $1,448,647.88—

the difference between its bid of approximately $2.1 million and the $650,000 resale price. This loss, combined with the deficiency judgment of $411,535.65 equals a total actual loss of $1,860,183.53.

■ Defendant asserts that this calculation of loss does not address the commitment made by Mr. Amendola to bid $2.1 million, which defendant says was made in consideration of the bankruptcy court lifting the automatic stay so the foreclosure sale could proceed. However, upon review of the transcript of the bankruptcy proceeding the day of the foreclosure sale, it is clear that Central Trust's commitment was for purposes of keeping the bankruptcy deficiency to a minimum, and was not a commitment regarding any future resale of the property. Item No. 96, Exhibit A, at 20–21. Thus, the Court finds unpersuasive defendant's characterization of Central Trust's $2.1 million bid as a commitment to provide him a credit of $2.1 million, and even if it did constitute some type of commitment regarding defendant's future liability, the Court would not be precluded from taking any subsequent loss sustained by the bank into consideration for purposes of sentencing.

■ In addition, it appears that the value of the property at the time of the foreclosure sale was substantially less than the original amount of the loan and the amount of Central Bank's agreed upon bid of $2.1 million. The trustee, Douglas W. Marky, Esq., had originally objected to the sale of the property and had had it adjourned. *Id.* at 19–20. However, at the March 12, 1990 proceeding, Mr. Marky indicated that he had obtained an appraisal on the property that indicated a value of approximately $1.5 million, and since there was "no way on earth that the property [could] be worth enough to clear us any cash," he would no longer oppose the sale or the bank's $2.1 million bid. *Id.* at 22. Contrary to defendant's representations, Mr. Marky, as trustee, had the authority to approve the foreclosure sale, not defendant. *Id.* at 19.

---

7. The actual amount of the bid was $2,098,-647.88. *See* Amendola Affidavit, Item No. 113,

Affidavit of W. Stephen Tierney, ¶ 12.

■ Defendant also argues that the $411,535.65 deficiency judgment obtained by Central Trust set a "monetary ceiling" on defendant's liability as a matter of law, such that he cannot be held responsible for the loss attendant on the ultimate low selling price. Defendant erroneously bases his argument on N.Y. Real Prop.Acts. & Proc.Law § 1371. As the Court has noted, the legal reality is that there is a difference between a deficiency judgment for purposes of defendant's civil liability and actual loss suffered by Central Trust for purposes of defendant's criminal liability. In determining defendant's guideline range, the Court's only concern is with calculating the amount of money actually and ultimately lost as a result of defendant's conduct. It has no concern with how Central Trust decided to handle a bad loan, and what the legal implications of those decisions are on the bank. "Monetary ceilings" placed on the bank under New York real property law place no similar restriction on the Court's calculation of Central Trust's actual loss for purposes of determining the correct offense level under the Sentencing Guidelines.

■ Defendant advances several additional objections to the PSR's calculation of loss that do not merit serious consideration. Defendant takes issue, for example, with Central Trust's representation that it underwent extensive efforts to market the property. *See* Item No. 113, ¶ 5. The Court, however, presumes that Central Trust acted in good faith in making bids and in reselling the property for the highest possible price. Moreover, defendant has presented no evidence that would lead the Court to the highly unlikely conclusion that Central Trust intentionally sought out a low selling place so as to saddle defendant with a higher amount of loss for purposes of sentencing. There is no reason why Central Trust would not try to sell the property for as much as possible since it knew that it would be unable to collect the deficiency from defendant, who was in bankruptcy. Further, selling the property for a low price would not benefit

Central Trust if, as defendant argues, it would be limited to the $411,535.65 deficiency judgment rendered by Justice Fallon.

■ Finally, defendant argues that had he been allowed to retain control over the property in question he would have been able to sell it at a higher price such that the bank would not have sustained any loss. He contends that there was no explanation for Central Trust's removing him from the day-to-day control over the property or from involvement in the eventual disposition of the property after the bank purchased it in foreclosure. Initially, this is not a viable objection to the PSR's calculation of loss because the assertion that defendant would have been able to obtain a higher price is pure speculation and does not support a conclusion that defendant should not be held responsible at sentencing for the loss that actually resulted. In addition, it was defendant's fraudulent conduct that resulted in the foreclosure of the mortgage such that it would have seemed improvident for Central Trust to keep defendant in control of the property or to believe he could find a higher bidder given his past conduct.

■ 2. *Home and City Bank.* The loss attributable to Home and City Bank is $204,604.55. Defendant contests this, asserting that Home and City actually profited from the $3.1 million loan it extended him.

The letter of Michael A. Hanna, Home and City Vice–President, and the affidavit of William P. Hessney, Esq., whose firm represented Home and City in connection with the instant loan, state that at the time of the foreclosure sale, the bank had sustained approximately $3.5 million in loss.[8] Item Nos. 100, Exhibit B; 111. The bank purchased the property in foreclosure for $3.3 million and later assigned its bid to 5287 Orchard Park, Inc. for $3.1 million. Item No. 111, ¶ 4–5. Thus, Home and City suffered an actual loss of $420,397.84—the difference between the total amount owed the bank at the time of foreclosure ($3,520,397.84) and the amount the property was ultimately assigned

**8.** The Hessney affidavit indicated that the amount of loss at the time of foreclosure was

$3,520.397.84. The Court will use this figure.

for ($3,100,000). This amount must then be reduced by any other money the bank recovered. Here, the $420,397.84 in loss was reduced by $60,966.56, representing tax escrow, and $154,826.73, funds held by the receiver. The total actual loss was therefore $204,604.55. *Id.* ¶ 8.

■ Defendant advances several arguments in support of his assertion that Home and City actually realized a profit from this loan. He contends that the bank released him from any further personal liability regarding the loan on April 16, 1990, and that N.Y.Real Prop.Acts. & Proc.Law, § 1371, precludes Home and City from obtaining the $204,604.55 deficiency from him. The Court finds that while Home and City did sign a release of liability on April 16, 1990, *see* Item No. 81, Exhibit A, and New York law may preclude the bank from going after defendant for the deficiency, the bank did sustain actual loss for purposes of defendant's criminal liability.

■ Defendant next argues that based on his interpretation of the bank's assignment of the property to 5287 Orchard Park, Inc., *see* Item No. 111, Exhibit B, there was no deficiency at all. Home and City contends that the property was ultimately assigned for a total of $3.1 million, and that the $100,000 of consideration mentioned in the assignment was part of the total $3.1 million it received from 5287 Orchard Park, Inc. Item No. 118, ¶ 4. Defendant argues that this interpretation is contrary to the actual language of the assignment, which indicates consideration for the assignment in an amount of $100,000 over and above the bank's original $3.3 million bid such that the bank actually realized a $100,000 profit on the loan. Based on the affidavits submitted by Home and City, the Court rejects defendant's interpretation of the assignment, and finds that Home and City realized a total of $3.1 million from the assignment to 5287 Orchard Park, Inc., resulting in a loss of $420,397.84.

As further evidence of the alleged inaccuracy of the PSR's calculation of loss, defendant points to inconsistent numbers in the government submissions—the letter from Mr. Hanna and the Hessney affidavits. Although there are slight discrepancies in the numbers, the Court reiterates that the calculation of loss need not be precise to the dollar figure. A discrepancy of approximately $4,000 is simply not relevant, as Home and City has consistently maintained that its loss was approximately $200,000.[9]

The Court notes that if defendant's arguments are taken to their logical conclusions, the Court would be compelled to find not simply that the banks sustained no loss, but that they actually benefitted from defendant's criminal activity such that defendant may be entitled to some form of monetary remuneration.

■ Thus, the Court finds that the PSR's calculation of the amount of loss is supported by a preponderance of the evidence. Despite defendant's attempts to involve the Court in a hypertechnical analysis of defendant's loans and a *de novo* review of the bankruptcy and foreclosure proceedings, the amount of loss need only be a reasonable estimate. The Court finds that the affidavits, letters and documentation submitted by the government possess sufficient indicia of reliability to support a finding that the banks sustained an amount of loss in excess of $2 million and that therefore a ten-level enhancement under § 2F1.1(b)(1) is appropriate.

### B. Obstruction of Justice

Defendant asserts that there is no basis for the Probation Department's recommendation that he be given a two-level upward adjustment for obstruction of justice pursuant to § 3C1.1. The PSR and the government assert several bases in support of the two-level upward adjustment.

9. Defendant also points to an inconsistency between the bank's calculation of loss and the numbers in a Statement of Sale by referee J. Vaughan Millane Jr., Esq. Item No. 109, Exhibit A. Although the Statement of Sale does note a deficiency of only $65,571.11, it is dated September 4, 1990, and refers to the initial sale of the property to the bank. Thus, its deficiency figure does not reflect the fact that the bank was ultimately able to sell the property for only $3.1 million.

■ Under § 3C1.1, a defendant who "willfully impedes or obstructs, or attempts to impede or obstruct the administration of justice during the investigation or prosecution of the instant offense," is subject to a two-level upward adjustment. 1987 Guidelines. The 1992 Guidelines clarify the Commission's initial intent, adding that the obstruction of the administration of justice can occur during sentencing on the instant offense as well as investigation or prosecution. *See also United States v. Perry,* 908 F.2d 56, 59 (6th Cir.) ("prosecution of an offense" for purposes of § 3C1.1 includes the sentencing proceedings), *cert. denied,* 498 U.S. 1002, 111 S.Ct. 565, 112 L.Ed.2d 571 (1990).

The Court finds that the two-level obstruction of justice enhancement can be based on several distinct grounds, any one of which would be sufficient for the adjustment: (1) defendant's perjurious testimony at trial; (2) his failure to make himself available to the Probation Department during the course of their pre-sentence investigation; and (3) his violations of the conditions of release.[10]

■ 1. *Perjurious Testimony at Trial.* The Application Notes in both the 1987 and 1992 Guidelines specifically include untruthful testimony at trial as a basis for a two-level obstruction adjustment. 1987 Guidelines, Application Note 1(c); 1992 Guidelines, Application Note 3(b). The Second Circuit has recently held that "the district court, evaluating the defendant's testimony in a light most favorable to the defendant, must make an independent determination at sentencing that the defendant testified untruthfully about a material fact with the intent to impede or obstruct the prosecution or investigation of an offense." *United States v. Cunavelis,* 969 F.2d 1419, 1423 (2d Cir.1992); *see also United States v. Burnette,* 981 F.2d 874, 878–79 (6th Cir.1992); *United States v. Lawrence,* 972 F.2d 1580, 1581–82 (11th Cir. 1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1015, 122 L.Ed.2d 162 (1993). Where a defendant's testimony "relates to an essential element of his [or her] offense ... [and] the evidence ... persuades the sentencing judge

that the defendant knew, at the time of testifying, that the statements to which he [or she] testified were untrue, [the two-level upward adjustment under § 3C1.1] would be appropriate." *United States v. Bonds,* 933 F.2d 152, 155 (2d Cir.1991). While the Application Notes provide that "[i]n applying [§ 3C1.1], suspect testimony and statements should be evaluated in a light most favorable to the defendant," 1987 Guidelines, Application Note 2; 1992 Guidelines, Application Note 1, it is clear that this "simply instructs the sentencing judge to resolve in favor of the defendant those conflicts about which the judge, after weighing the evidence, has no firm conviction." *United States v. Matos,* 907 F.2d 274, 276 (2d Cir.1990) (quoting *United States v. Franco–Torres,* 869 F.2d 797, 801 (5th Cir.1989)).

The Court finds that defendant's testimony at trial was untruthful as to essential elements of the crimes for which he was convicted, and that he knew, at the time of testifying, that such testimony was untrue. At trial, defendant testified that he had nothing to do with the preparation of the false submissions to Central Trust or Home and City. More specifically, he testified that he only had general discussions with Kathleen Stachura concerning the Home and City loan and had nothing to do with the alteration of leases that were submitted to that bank. *See* Transcript, Item No. 92, at 3329, 3337–39. Ms. Stachura's testimony, to the contrary, was that defendant reviewed every document that went to the bank and that he told her to alter leases before they went to the bank. *See* Transcript, Item No. 88, at 2325–29; 2334–36. The jury clearly found her testimony credible in convicting defendant of submitting false statements to the bank, and demonstrates that defendant's testimony to the contrary was untruthful.

Defendant delves into the specifics of the testimony in question and erroneously focuses on very particular portions, which he says indicate significant discrepancies in what was asked each witness such that there can be no finding of perjury. He points, for example,

---

**10.** There may be other grounds for the obstruction enhancement which the Court will not ad- dress.

to the fact that Ms. Stachura was asked about defendant's "review of documents," while defendant was only asked about "discussions" with Ms. Stachura regarding such documents; and that Ms. Stachura testified that she could not recall whether her discussions with defendant regarding changes in the leases were by telephone or in person, while defendant was asked about "telephone" conversations regarding such changes.

■ The Court finds such arguments unfocused and *without merit.* While the Court must find specific instances of perjury by the defendant so as to protect the defendant's right to take the stand, the testimony at trial is not to be analyzed under a microscope; nor is the prosecutor to be required to ask the identical questions of defendant as he or she asked of witnesses such that, in the event of conviction, the proof that defendant testified untruthfully is beyond any doubt. Having heard and reviewed the portions of the trial testimony in question, the Court finds that defendant's argument is nothing more than an unjustified and unwarranted dissecting of the testimony, focusing on particular words in a way that a jury certainly would not have. When considered as a whole, the Court finds that defendant's testimony was fundamentally at odds with Ms. Stachura's testimony regarding defendant's knowledge that false statements were being submitted to the banks such that the jury, in convicting defendant on these counts, clearly found that his testimony was false.

■ The Court is not imposing the obstruction enhancement simply because defendant testified and was found guilty on four of eight counts. A sworn witness is guilty of perjury when he or she makes statements that he or she knows to be false. *See* 18 U.S.C. § 1621; *see also Bronston v. United States,* 409 U.S. 352, 357, 93 S.Ct. 595, 599,

34 L.Ed.2d 568 (1973). Here, by finding defendant guilty of submitting false statements to banks and devising a scheme to obtain money by false statements, the jury necessarily determined that defendant knew the statements in question, contained in various documents submitted to the banks, were false. Defendant testified that he knew nothing about the alteration of the leases. It is clear from the jury verdict, which the Court upheld in denying defendant's Rule 29 motion, that defendant's testimony was false.

In addition, because defendant's testimony regarding the false statements contained in the bank documents concerned his own state of mind—"a matter about which he was peculiarly knowledgeable—it is reasonable to conclude that [he] was aware, at the time of testifying, that his statements were untrue." *See Bonds,* 933 F.2d at 155. Contrary to defendant's assertion, the testimony of defendant and Ms. Stachura regarding conversations or discussions about changes made to bank documents relates to essential elements of the offenses for which defendant was found guilty—knowledge of the falsity of the statements, and participation in the acts charged—such that "the judgment of conviction necessarily constitutes a finding that the contested testimony was false." *Id.* The perjury in question was not about extraneous matters; it was material, and directly impacted the elements of the crimes charged. Therefore, the Court finds that a two-level adjustment for obstruction based on trial perjury is warranted.

■ 2. *Failure to be Available to the Probation Department.* The PSR bases the two-level upward adjustment for obstruction of justice on defendant's failure to be available to the Probation Department throughout the course of its investigation.[11] Defendant argues that there can be no obstruction

11. While the Sentencing Guidelines provide for a two-level upward adjustment for obstruction of justice based on failure to appear for sentencing, 1992 Guidelines, Application Note 3(e), because of potential double jeopardy problems, *see United States v. Perdomo,* 927 F.2d 111, 116 (2d Cir. 1991), the Court specifically notes that defendant's upward adjustment for obstruction is not based on his failure to appear for sentencing on March 6, 1992, as that charge is the basis of a

separate indictment, 92–CR–104A, which charges defendant with bail jumping in violation of 18 U.S.C. § 3146(a).

An upward adjustment for obstruction based on failure to be available to the Probation Department does not implicate double jeopardy concerns as the adjustment is not based on defendant's absence from the jurisdiction *per se,* but only on his unavailability to Probation.

adjustment on this basis because there were no attempts to contact him by the Probation Department after the January 2, 1992 interview, and no indications by the Probation Officer that additional contacts would be necessary. Because even a perfunctory inquiry would have revealed the Probation Officer's attempts to contact defendant, *see infra*, the Court finds defendant's argument a negligent or reckless misrepresentation of fact.

As the Court noted in its recusal decision, defendant's availability for one interview did not satisfy his responsibility to be available to the Probation Department during the entirety of its investigation, which lasted until mid-February, 1992. Item No. 105, at 10. It is routine procedure for the Probation Department to have follow-up conversations, discussions and or contacts with defendants. *See* Item No. 125, Memorandum from Colleen Rahill–Beuler to Court, December 4, 1992.

Here, Colleen Rahill–Beuler, the Probation Officer assigned to prepare the PSR, recalls that at the January 2, 1992 interview, defendant requested information regarding what his guideline sentence would be, and was advised that specific numbers could only be provided after review of all the material. Defendant informed Ms. Rahill–Beuler that he had paperwork regarding the amount of loss and they agreed that she would get the materials from him during one of their subsequent contacts regarding the presentence investigation. *Id.* Ms. Rahill–Beuler specifically recalled that in furtherance of her efforts to work with defendant during the presentence investigation period, she unsuccessfully attempted a home visit on January 16, 1992, and on January 23, 1992, made a home visit and contacted defendant's wife. During this time, Ms. Rahill–Beuler also recalled leaving two phone messages with defendant's wife asking that defendant contact her. Defendant never did. *Id.* It is clear from Ms. Rahill–Beuler's Memorandum, which the Court finds credible, that defendant was aware, or should have been aware that his obligations, for purposes of the Probation

Department's investigation, were not complete.

■■■ Further, even had Probation not attempted to contact defendant, an upward adjustment for obstruction on this basis would be warranted. Defendant left the jurisdiction without the Court's permission. By mid-January, the Court was informed that attempts by the Probation Department and defendant's own counsel to contact him had been unsuccessful and that there was a possibility that he had left the jurisdiction. By January 23, 1992, less than three weeks after Ms. Rahill–Beuler's January 2, 1992 meeting with defendant, a bench warrant was issued. Defendant's suggestion that the Probation Officer was required to attempt to call him or his attorneys and request additional meetings or information, despite the fact that he had left the jurisdiction, in order to preserve the record in the event he came back and contested his obstruction adjustment is non-sensical.

■■■ Defendant next argues that he did not act willfully, that is, that his unavailability was not designed to impede the course of the Probation Department's investigation. The Court disagrees. As a result of his meeting with Probation, defendant knew that Ms. Rahill–Beuler was in the midst of her presentence investigation; he knew there was at least a potential that there would be requests for additional information from Probation; he knew he was scheduled for sentencing on March 6, 1992; and he knew that leaving the jurisdiction prior to sentencing would in some way obstruct or impede the administration of justice by impeding the Probation Department's ability to prepare the PSR [12] and hampering the review of the PSR when it was ultimately sent out. The Court finds that defendant intended this result.

Thus, the two-level upward adjustment for obstruction based on defendant's unavailability to Probation is warranted.

■■■ 3. *Violation of the Conditions of Bail.* Another ground for the enhancement

---

12. The fact that the PSR was ultimately prepared does not preclude an obstruction enhancement because defendant's leaving the jurisdiction had at least the potential for obstructing justice and was therefore material for purposes of § 3C1.1.

for obstruction is defendant's failure to comply with the conditions of bail. The defendant was released on bail pending sentencing with the restriction that he not travel outside the counties of Erie, Genesee, Monroe, Cattaraugus, Wyoming and Chautauqua. Defendant's violation of this restriction constitutes at least an attempt to obstruct justice, which attempt also can be a basis for the adjustment under § 3C1.1. *See United States v. Jackson*, 974 F.2d 57, 61 (7th Cir. 1992) ("It was well within the discretion of the district court to consider [defendant's] violation of his bail conditions as an attempt to obstruct justice."). Thus, the two-level enhancement for obstruction based on defendant's failure to comply with the conditions of bail is warranted.

The Court, therefore, adopts the PSR's recommendation of a two-level upward adjustment for obstruction of justice pursuant to § 3C1.1, and finds that such adjustment is compelled by any one of the above-mentioned grounds.[13]

### C. Upward Adjustment for More than Minimal Planning

■ Defendant contends, without factual or legal support, that he should not be given the two-level upward adjustment for more than minimal planning. *See* Item No. 10. The Court, however, finds that the preponderance of the evidence at trial established that this adjustment is appropriate.

Section 2F1.1(b)(2)(A) provides for a two-level increase in the offense level if the offense involved more than minimal planning. "More than minimal planning" is defined in the Commentary to § 1B1.1 as "more planning than is typical for commission of the offense in a simple form.... 'More than minimal planning' is deemed present in any case involving repeated acts over a period of time, unless it is clear that each instance was purely opportune." Application Note 1(f). Not only does defendant fail to provide any evidence or legal argument that would dictate that an upward adjustment on this basis is improper, but it is clear from Application

Note 1(f) that where, as here, defendant's crimes involved repeated submission of false statements over a period of time, such an adjustment is appropriate. The evidence and testimony at trial regarding the nature of defendant's scheme to obtain money from the banks by submission of false statements supports the two-level adjustment on this basis.

### D. Upward Adjustment for Supervisory Role in the Offense

■ Defendant also asserts a general objection to the two-level upward adjustment for role as manager or supervisor in the offenses. Section 3B1.1(c) provides for a two-level increase if the defendant was an "organizer, leader, manager, or supervisor in any criminal activity...." The Commentary to this section notes that the inclusiveness of § 3B1.1(c) reflects that "[i]n relatively small criminal enterprises ... the distinction between organization and leadership, and that of management or supervision, is of less significance than in larger enterprises that tend to have clearly delineated divisions of responsibility."

The two-level enhancement is appropriate here where the preponderance of the evidence established that defendant instructed other individuals to alter leases and other documentation that were subsequently submitted to banks in support of defendant's loan applications. For example, Kathleen Stachura testified that with regard to both loans, defendant directed her to after and/or create leases with Roseanne Adamowich's assistance, before submitting the documents to the bank. Transcript, Item No. 88, at 2290–2304 (Central Trust); 2334–36 (Home and City).

The evidence and testimony at trial revealed that defendant was the manager and supervisor regarding the loan transactions that formed the basis of the charges on which he was convicted; that he reviewed all documents before they were submitted to the banks; and that he kept close tabs on the

---

**13.** The existence of multiple obstructions could be the basis for an upward departure pursuant to § 5K2.0.

work being done at the various offices. The Court therefore adopts the PSR's recommendation of a two-level enhancement for defendant's leadership or supervisory role in the offense.

E. Grouping of Offenses under the Sentencing Guidelines for Purposes of Calculating Defendant's Offense Level [14]

██ Defendant asserts, in objecting to the Probation Department's application of the Sentencing Guidelines in determining his offense level, that: (1) Counts V and VI and Counts VII and VIII should be separately grouped; and (2) that the calculated offense level on Counts V and VI can be no greater than level 14, which corresponds to a guideline range of 18–24 months (Criminal History Category II), because the statutory maximum on Counts V and VI is 24 months. These arguments are based on defendant's assertion that § 5G1.1(a)'s provision that "[i]f application of the guidelines results in a sentence above the maximum authorized by statute for the offense of conviction, the statutory maximum shall be the guideline sentence," applies to the calculation of the offense level on that count under § 1B1.1(a)–(d).

Defendant's analysis of the Guidelines is fatally flawed in that defendant attempts to take sections of the Guidelines that apply strictly to sentencing, and apply them to sections that deal only with the calculation of the offense level. As defendant argues, the various sections of the Guidelines are meant to be applied in a specific order. Section 1B1.1 provides that after determining the base offense level for the particular count of conviction and applying any specific offense characteristics, the provisions of Parts A, B and C of Chapter 3 are to be applied. This calculation is to be made for each count of conviction, and then the counts are to be grouped in accordance with Ch. 3, Pt. D.

After applying any adjustment for acceptance of responsibility, the resulting offense level is the "total offense level." 1987 Guidelines, § 1B1.1(a)–(e). Defendant's criminal history category is then calculated, and the guideline range that corresponds to that criminal history category and the total offense level is the relevant guideline range. § 1B1.1(f), (g). Only after the guideline range is determined are the provisions of Chapter 5, and in particular Part G of Chapter 5, consulted in order to determine "the sentencing requirements and options related to probation, imprisonment, supervision conditions, fines, and restitution." § 1B1.1(h).

██ While defendant has focused on § 1B1.1 as the correct way to determine defendant's guideline range, he has conveniently chosen not to follow those application instructions when they do not work to his benefit. The preliminary steps, subsections (a) through (e), deal with the calculation of the offense level. Subsections (h) and (i) deal with the actual imposition of sentencing. The purpose of Ch. 5, Pt. G, which defendant relies on in asserting that defendant's offense level on the false statement counts can be no greater than a level 14, is simply to ensure that the actual sentence of imprisonment imposed adequately reflects the total offense level calculated by application of the Guidelines without being higher or lower than any statutory maximum or minimum on the particular counts. Chapter 5, Pt. G has nothing to do with the calculation of the offense levels on the various counts of conviction, nor on their subsequent grouping under Ch. 3, Pt. D.

The Court finds that the PSR's calculation of defendant's offense level is correct under the Guidelines. In calculating the offense level for each count of conviction under § 1B1.1, Counts V and VI each result in an offense level of 19,[15] and Counts VII and

---

**14.** The Court notes that the grouping argument is a legal issue which arguably was not waived as a result of defendant's failure to file timely objections to the PSR pursuant to the Local Guidelines. This issue, however, was raised for the first time on November 4, 1992, in defendant's memorandum of law in support of his motion for reconsideration. Item No. 110, at 25.

**15.** The offense level is calculated as follows: base offense level of 6, plus a 7 level increase for an amount of loss of approximately $204,000. 2F1.1(a), (b)(1)(H). *See* § 1B1.1(a) & (b). To the 13 is added a 6 level increase representing upward adjustments for more than minimal planning, § 2F1.1(b)(2)(A), obstruction of justice,

VIII each result in an offense level of 21.[16]

■ Section 1B1.1(d) then indicates that the counts should be grouped in accordance with Ch. 3, Pt. D. Section 3D1.2(d) provides that: "[c]ounts are grouped together if the offense level is determined largely on the basis of the total amount of harm or loss, ... or some other measure of aggregate harm...." It specifically states that offenses under § 2F1.1, such as the offenses involved here, are to be so grouped. *Id.* Thus, defendant's contention that Counts V and VI should have been grouped separately from Counts VII and VIII because they relate to different banks or because they involve different statutory maximums, is without merit.

Section 3D1.3(b) provides that:

[i]n the case of counts grouped together pursuant to § 3D1.2(d), *the offense level applicable ... is the offense level corresponding to the aggregated quantity, determined in accordance with Chapter Two and Parts A, B and C of Chapter Three.* When the counts involve varying offenses, apply the offense guideline that produces the highest offense level.

(emphasis added). Here, the aggregated quantity of loss for all four of the grouped counts is in excess of $2 million. Going to Chapter Two, and specifically § 2F1.1(b)(1), the corresponding offense level for such loss is an increase of ten levels. § 2F1.1(b)(1)(K). When the adjustments for more than minimal planning, obstruction of justice and supervisory role are added, the resulting base

§ 3C1.1, and supervisory role in the offense, § 3B1.1(c). *See* § 1B1.1(c).

**16.** The offense level is calculated as follows: base offense level of 6, plus a 9 level increase for an amount of loss of approximately $1.8 million. § 2F1.1(a), (b)(1)(J). *See* § 1B1.1(a) & (b). To the 15 is added a 6 level increase representing upward adjustments for more than minimal planning, § 2F1.1(b)(2)(A), obstruction of justice, § 3C1.1, and supervisory role in the offense, § 3B1.1(c). *See* § 1B1.1(c).

**17.** *Because the instant offenses clearly must be grouped pursuant to § 3D1.2(d), it is arguably unnecessary to go through the application procedure provided in § 1B1.1, as the Application Notes to § 3D1.3 provide that:* "[w]hen counts are grouped pursuant to § 3D1.2(d), ... [d]eter-

offense level is 22—the same offense level calculated by the Probation Department.[17]

In terms of the application of the Guideline provisions under Part G of Chapter Five, it is clear that for purposes of sentencing, a term of imprisonment of no more than 24 months can be imposed on Counts V, VI and VIII, as the statutory maximum for violations of 18 U.S.C. § 1014 is two years. The term of imprisonment imposed on Count VII can be no greater than 60 months, as the statutory maximum for violations of 18 U.S.C. § 1341 is five years. Such requirements, however, have no bearing on the initial calculation of defendant's offense level, which, with a criminal history category of II, corresponds to a guideline range of 46–57 months.

Moreover, the Court notes that taking defendant's interpretation of the Guidelines to its logical conclusion would result in a higher offense level than that calculated by Probation—23 rather than 22. In addition, if Counts V and VI and Counts VII and VIII were separately grouped, and defendant separately sentenced on those groups, the same sentence would result because § 5G1.2(d) would require imposition of a sentence on Counts V and VI consecutive to that on Counts VII and VIII in order to satisfy the total sentence of 46 to 57 months called for under the Guidelines, which Guideline range is within the 60 month statutory maximum for Count VII.

Thus, the Court finds that the PSR properly grouped the counts of conviction, and properly calculated defendant's offense level.

mine whether the specific offense characteristics or adjustments from Chapter Three, Parts A, B and C apply based upon the combined offense behavior taken as a whole." Application Note 3. Application Note 6 of § 2F1.1 provides that: "[s]ome fraudulent schemes may result in multiple-count indictments.... The cumulative loss produced by a common scheme or course of conduct should be used in determining the offense level, regardless of the number of counts of conviction."

These instructions seem to obviate the necessity, for purposes of offenses under § 2F1.1, of going through steps (a) through (c) of § 1B1.1 for each count of conviction since the counts are to be considered together for purposes of applying specific offense characteristics such as amount of loss, as well as adjustments under Parts A, B and C of Chapter Three.

## CONCLUSION

For the reasons stated, the Court finds that defendant forfeited without cause shown, or knowingly and voluntarily waived, his right to raise factual objections to the PSR by failing to timely file such objections. Nevertheless, the Court has considered these objections and, for the reasons set forth above: (1) adopts the recommendation that the amount of loss sustained by the victim banks was in excess of $2 million dollars such that a ten-level enhancement is warranted; (2) adopts the recommendation that a two-level upward adjustment be given for obstruction of justice pursuant to § 3C1.1; (3) adopts the recommendation that a two-level upward adjustment be given for more than minimal planning pursuant to § 2F1.1(b)(2)(A); (4) adopts the recommendation that a two-level upward adjustment for supervisory role in the offense be given pursuant to § 3B1.1(c); and (5) finds that the counts of conviction were properly grouped under the Guidelines and that defendant's offense level was properly calculated at level 22.

The defendant is ordered to appear before the Court for sentencing on February 22, 1993 at 9:15 a.m.

IT IS SO ORDERED.